Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA MILLER, Individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>PCM, INC., FRANK F. KHULUSI, and BRANDON H. LAVERNE,<br><br>　　　Defendants. | Case No. 2:17-cv-03364-VAP-KS<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Stephen Wise, Kenneth Rubenfeld, and Radovan Rasa ("Plaintiffs"), by and through their attorneys, individually and on behalf of all other persons similarly situated, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and

- 1 -

announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PCM, Inc. ("PCM" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action against Defendants PCM, Frank F. Khulusi ("Khulusi"), PCM's Chief Executive Officer ("CEO") and Chairman of the Board, and Brandon H. LaVerne ("LaVerne"), PCM's Chief Financial Officer ("CFO"), Chief Accounting Officer, and Treasurer, on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of PCM from August 10, 2015 through May 2, 2017, both dates inclusive (the "Class Period").  Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      PCM is a reseller of computer hardware and software to mid and large sized companies, and to government entities.  PCM further provides IT services to its customers.  On March 16, 2015, PCM filed an 8-K with the Securities & Exchange

Commission ("SEC"), announcing that it had entered into an Asset Purchase Agreement ("APA") to acquire the IT solutions assets of En Pointe Technologies Sales, Inc., founded by Attiataz "Bob" Din in 1993, a publicly traded company with its principal office in California. En Pointe Technologies Sales is now known as Collab9, Inc. ("Collab9"), and at the time of the acquisition, Bob Din owned 70% of Collab9's stock. PCM placed the assets it purchased in a wholly owned subsidiary it called En Pointe Technologies Sales, LLC. En Pointe was PCM's largest and most important acquisition in its history.[1]

3.    On June 17, 2015, PCM filed an 8-K, to which it attached En Pointe's financial statements for the fiscal years ending September 30, 2012, 2013, and 2014, which PCM told investors were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). PCM further attached "pro forma results," combining the financial results of PCM and En Pointe, for the period of the calendar year of 2014, and for the first three months of 2015. In the same filing, PCM attributed $40 million in goodwill to the En Pointe assets, and over $8 million in "intangible assets" to En Pointe, the vast majority of which, $6.2 million, were designated for "non-compete agreements" and "contractual relationships."

---

[1] For the sake of clarity, the entity which sold the IT solutions assets to PCM will be referred to, throughout, as "Collab9." The subsidiary of PCM that acquired and owns the IT assets will be referred to, throughout, as "En Pointe."

Class Action Complaint for Violation of the Federal Securities Laws

4.      PCM quickly discovered that the En Pointe financials it presented to investors, and thus the pro forma results also, were materially false, overstated En Pointe's earnings by millions of dollars, materially overvalued En Pointe's assets and earning capacity, and that the economic loss to PCM was "far greater" than the millions of dollars of overstated value.  PCM has plainly admitted as much in a proposed Amended Answer it seeks to file in an unrelated Delaware state court case brought by Collab9.  PCM has further admitted the materiality of the overstatement of earnings, stating in the Delaware case and in private correspondence from its attorney to opposing counsel, that had PCM known the financials were false, *it would not have purchased En Pointe*.

5.      The En Pointe assets came with a contractual relationship with a company called Ovex Technologies, Ltd. ("Ovex").  Ovex, a Pakistani company, was founded in 2003 by the same Bob Din who owned a majority of Collab9, for the express purpose of providing IT and other services to En Pointe's customers, and recruiting and retaining customers.  After the acquisition, Ovex serviced not only En Pointe's customers, but, according to PCM itself in a filing in a separate lawsuit, "[s]ince the closing date, Ovex has maintained and operated PCM's information technology structure."  Ovex employees had access to all of En Pointe's confidential information and trade secrets, and strict non-compete agreements.  According to PCM, the services provided by Ovex are "essential to [PCM's] operations," and "PCM cannot effectively

- 4 -

Class Action Complaint for Violation of the Federal Securities Laws

gain access to and make use of significant portions of [PCM's] operational data other than through Ovex."

6.    The Ovex relationship quickly went sour.  Ovex employees refused to provide PCM with its own confidential information.  Ovex supervisors copied confidential information and trade secrets onto external hard drives, shared the information with one of PCM's largest competitors, and solicited other Ovex employees to breach their non-compete agreements and move to the same competitor.  Those employees then began wooing PCM's customers to move to the competitor.  PCM has admitted all these facts in another lawsuit it brought in California state court against one of the Ovex supervisors.  Further, PCM has admitted the materiality of the problems with the Ovex relationship.  In court filings in the Delaware case, PCM claims that Bob Din and Collab9 had *de facto* control over Ovex, directed the efforts that harmed PCM and its customer relationships, and that had PCM known of Din's and Collab9's influence over Ovex [2] which, in the Delaware case, PCM stated "diminish[ed] the value of the Business after the Closing," *it would not have purchased En Pointe*.

---

[2] PCM's claim of ignorance as to Din's and Collab9's influence over Ovex is suspect. Din founded Collab9, was its majority shareholder, founded Ovex to provide services to Collab9, almost exclusively, and was a signatory to the APA.

- 5 -

7. Throughout the Class Period, Defendants have knowingly or recklessly misrepresented material facts to investors and omitted others, violating GAAP and SEC regulations at each turn. PCM has never told investors that the En Pointe financials and pro forma results it filed were materially false and not prepared in accordance with GAAP, it has never restated or corrected those financials, never told investors that the financials should no longer be relied upon, has never taken an impairment to either goodwill or intangible assets, and never told investors that Ovex existed, much less of the severe problems with the relationship. PCM, in every quarterly and annual filing, warns investors, generally, about the possibility that it might need to impair goodwill or intangible assets, or that problems with partners such as Ovex might materially affect its customer relationships and bottom line but has failed in its duty to inform investors that the general risks had materialized. In every filed quarterly and annual statement during the Class Period, PCM has instead affirmatively, and falsely, stated that it does not need to impair either goodwill or intangible assets.

8. Defendants, to date, have failed to acknowledge in SEC filings the facts they admit in private, and in obscure court filings in other matters. As a direct and proximate result of Defendants' knowing or reckless wrongdoing, Plaintiffs and the Class suffered damages.

Class Action Complaint for Violation of the Federal Securities Laws

**JURISDICTION AND VENUE**

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.    Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants' principal executive offices are located in this judicial district.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.    Plaintiffs purchased PCM securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.

14.    Defendant PCM is a multi-vendor reseller of technology products and solutions. The Company primarily sells both hardware and software, including device products, servers, storage products, networks, printers, and related accessories and

Class Action Complaint for Violation of the Federal Securities Laws

devices. The company also provides software asset management, and hardware sales and services, as well as software value-added reseller services, managed services, cloud-based services, consulting, and IT management and related services. Among PCM's top partners are such companies as Microsoft, HP, and Dell. The Company is incorporated in Delaware and its principal executive offices are located at 1940 East Mariposa Avenue, El Segundo, CA 90245. The Company's securities are traded on NASDAQ under the ticker symbol "PCMI."[3]

15. Defendant Frank F. Khulusi, a co-founder of PCM, has been the Company's CEO and Chairman of the Board since 1987.

16. Defendant Brandon H. LaVerne has been the CFO, Chief Accounting Officer, and Treasurer of PCM since 2007.

17. Defendants Khulusi and LaVerne are sometimes referred to herein as the "Individual Defendants."

18. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

---

[3] PCM was previously known as "PC Mall."

- 8 -

(c)      was privy to confidential proprietary information concerning the Company and its business and operations;

(d)      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

(g)      signed false certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"),[4] attesting to the material accuracy of financial statements and effectiveness of the Company's internal controls; and/or

(g)      approved or ratified false and misleading statements in violation of the federal securities laws.

---

[4] In each SOX Certification cited in this Complaint, the signer certified that "as of the date hereof, solely for purposes of Title 18, Chapter 63, Section 1350 of the United States Code, that to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), of the Securities Exchange Act of 19334, and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company as of the dates and for the periods indicated."

Class Action Complaint for Violation of the Federal Securities Laws

19.     PCM is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

21.     Defendant PCM and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

*PCM's Acquisition of En Pointe*

22.     On March 16, 2015 PCM filed an 8-K with the SEC, signed by Defendants Khulusi and LaVerne,[5] announcing that on March 13, 2015,[6] PCM had entered into an APA to acquire the assets of En Pointe from Collab9, a publicly traded company with its principal office in California.  Attached as an exhibit to the 8-K was a press release entitled, "PCM to Acquire Assets of [Collab9]."  In the press release PCM announced

---

[5] Khulusi was described on the signature page as "Chairman and Chief Executive Officer (Principal Executive Officer)," and LaVerne as "Chief Financial Officer, Chief Accounting Officer, Treasurer and Assistant Secretary (Principal Financial and Accounting Officer)."

[6] The APA was actually entered into on March 12, 2015.

Class Action Complaint for Violation of the Federal Securities Laws

that the purchase price was $15 million up front, and "certain contingent earn-out consideration over a three year period" ("earn-out").  The press release stated that En Pointe "specializes in Microsoft-centric IT environments, offering hardware, software licensing and services," and that "as one of the largest Systems Integrators and Licensing Solutions Providers in the United States, En Pointe assists customers in architecting, acquiring, and implementing integrated IT solutions anchored to the Microsoft ecosystem."  En Pointe's customers included "small, mid-market and enterprise commercial clients, as well as state and local government, education and non-profit organizations in the United States."  Some of En Pointe's customers were listed, including Cisco Gold, Google Premier, HP Platinum, Lenovo Premier, and Microsoft LSP.

23.    Among the assets PCM purchased were En Pointe's customer relationships, confidential information, and proprietary business model.  PCM, in a filing in the lawsuit in California, described the acquired assets as "extremely valuable."  PCM admits that a "significant part of En Pointe's business" is salespersons "utiliz[ing] En Pointe's confidential customer and pricing information to develop and maintain valuable and long-lasting customer relationships."

24.    PCM touted the importance of the En Pointe acquisition to investors.  PCM described En Pointe in the March 16, 2015 press release as the "largest acquisition by PCM… based on revenues," that would "bring the consolidated business

Class Action Complaint for Violation of the Federal Securities Laws

significantly increased scale." CEO Khulusi was quoted stating that "[w]e also believe En Pointe will bring significant software and solutions experience that will ultimately benefit the PCM customer base as well. We are proud to have the En Pointe team join us."

25.    The March 16, 2015 press release included a quote from Bob Din, described as "Chief Executive Officer of En Pointe," praising En Pointe and PCM.

26.    Section 2.3 of the APA stated that of the $15 million initial purchase price, Din would receive $9 million, described as a "Goodwill Payment." Section 1.5, under the heading "Din Goodwill" stated that "at the Closing, Primary Stockholder shall sell, transfer, convey and assign to Purchaser, and Purchaser shall purchase from Primary Stockholder, all of Primary Stockholder's rights and interest in, to and under the goodwill of Primary Stockholder used or attributed to the operation of the Business (collectively, the 'Din Goodwill')."

27.    That same date, March 16, 2015, PCM filed its annual report for the fiscal year ended December 31, 2014 ("2014 10-K"), signed by the Individual Defendants, who also each signed SOX Certifications. The 2014 10-K, under "Subsequent Events," described the earn-out portion of the sales price in more detail, as "future contingent earn-out consideration, including 22.5% of the future adjusted gross profit of the business and 10% of certain service revenues over the next three years." The Company stated that it expected the transaction to close on April 1, 2015.

Class Action Complaint for Violation of the Federal Securities Laws

28.     On April 7, 2015 PCM filed an 8-K and accompanying press release, entitled "PCM Completes Acquisition of Assets of En Pointe Technologies Sales, Inc.," signed by Defendant LaVerne.   The press release stated that "En Pointe Technologies Sales helps customers stay ahead by delivering technology to power the modern office and data center. As one of the largest national solution providers, customers leverage En Pointe for designing, acquiring, deploying, and supporting technology across their organization."

29.     On April 29, 2015 PCM filed an 8-K, signed by Defendant LaVerne, to which the APA was attached as an exhibit.   The signatories to the APA on behalf of PCM were Defendants Khulusi and LaVerne.   Signing on behalf of En Pointe was Attiataz "Bob" Din, listed as CEO and "Primary Stockholder."  Section 6.5 of the APA, entitled "Financial Statements," stated that Collab9 had delivered to PCM audited En Pointe financial statements for the fiscal years ended September 30, 2012, 2013, and 2014, and unaudited financial statements for the final three months of calendar year 2014.   Section 6.5 further stated that the financial statements were prepared in accordance with GAAP, and were "true, accurate and complete in all respects."

***PCM Files En Pointe's Financial Statements and Pro Forma Results with the SEC***

30.     On June 17, 2015 PCM filed an 8-K/A, signed by Defendant LaVerne, amending the April 7, 2015 8-K, to include the En Pointe audited financial statements for the fiscal years ended September 30, 2012, 2013, and 2014, as well as the unaudited

financial statements for the final three months of 2014 and 2013.  Included in exhibits

were En Pointe's income statements for the three years cited:

### EN POINTE TECHNOLOGIES SALES, INC.
### STATEMENTS OF INCOME AND COMPREHENSIVE INCOME
### FOR THE YEARS ENDED SEPTEMBER 30, 2014, 2013 AND 2012
### (in Thousands)

|  | Years Ended December 31, | | |
|  | 2014 | 2013 | 2012 |
|---|---|---|---|
| Net sales: | | | |
|   Product | $ 375,578 | $ 306,614 | $ 295,206 |
|   Service | 17,001 | 14,904 | 15,519 |
|     Total net sales | 392,579 | 321,518 | 310,725 |
| | | | |
| Cost of sales: | | | |
|   Product | 325,234 | 262,182 | 254,697 |
|   Service | 8,677 | 9,406 | 9,677 |
|     Total cost of sales | 333,911 | 271,588 | 264,374 |
| | | | |
| Gross profit: | | | |
|   Product | 50,344 | 44,432 | 40,509 |
|   Service | 8,324 | 5,498 | 5,842 |
|     Total gross profit | 58,668 | 49,930 | 46,351 |
| Operating expenses: | | | |
|   Selling and marketing expenses | 46,449 | 40,667 | 36,014 |
|   General and administrative expenses | 6,906 | 6,519 | 6,659 |
|     Operating income | 5,313 | 2,744 | 3,678 |
| | | | |
| Other (expense) income: | | | |
|   Interest expense, net | (577) | (539) | (710) |
|   Other income (expense), net | 1,658 | 80 | 95 |
|     Total other income (expense), net | 1,081 | (459) | (615) |
| | | | |
| Income from continuing operations before provision for income taxes | 6,394 | 2,285 | 3,063 |
|   Provision for income taxes | 393 | 60 | 943 |
|   Net income from continuing operations | 6,001 | 2.225 | 2,120 |
| Loss from discontinued operations, net of tax | — | — | (1,346) |
| | | | |
| Net income | 6,001 | 2,225 | 774 |
| | | | |
| Other comprehensive income (loss), net of tax | | | |
|   Valuation adjustment for equity positions | 24 | (219) | (160) |
|     Comprehensive income | $ 6,025 | $ 2,006 | $ 614 |

Class Action Complaint for Violation of the Federal Securities Laws

31.    PCM further created and published combined "pro forma" financial results for calendar year 2014, as if PCM had acquired En Pointe on January 1, 2014, and combined pro forma financial results for the three months ended March 31, 2015, as if PCM had acquired En Pointe on January 1, 2015:

**PCM, INC.**
**Unaudited Pro Forma Combined Statement of Operations**
**For the Year Ended December 31, 2014**
**(In Thousands)**

| | PCM FYE December 31, 2014 | En Pointe FYE September 30, 2014 | Pro Forma Adjustments | Pro Forma Combined FYE December 31, 2014 |
|---|---|---|---|---|
| Net sales | $ 1,356,362 | $ 392,579 | | $ 1,748,941 |
| Cost of goods sold | 1,164,295 | 333,911 | | 1,498,206 |
| Gross profit | 192,067 | 58,668 | | 250,735 |
| Selling, general and administrative expenses | 176,362 | 51,697 | $ 1,347(n) | 229,406 |
| Operating profit | 15,705 | 6,971 | (1,347) | 21,329 |
| Interest expense, net | 3,180 | 577 | 329(o) | 4,086 |
| Income from continuing operations before income taxes | 12,525 | 6,394 | (1,676) | 17,243 |
| Income tax expense | 5,490 | 393 | 1,675(p) | 7,558 |
| Income from continuing operations | 7,035 | 6,001 | (3,351) | 9,685 |
| Loss from discontinued operations, net of taxes | (1,570) | — | — | (1,570) |
| Net income | $ 5,465 | $ 6,001 | $ (3,351) | $ 8,115 |
| **Basic and Diluted Earnings (Loss) Per Common Share** | | | | |
| Basic EPS: | | | | |
| Income from continuing operations | $ 0.57 | | | $ 0.79 |
| Loss from discontinued operations, net of taxes | (0.12) | | | (0.13) |
| Net income | $ 0.45 | | | $ 0.66 |
| Diluted EPS: | | | | |
| Income from continuing operations | $ 0.55 | | | $ 0.75 |
| Loss from discontinued operations, net of taxes | (0.13) | | | (0.12) |
| Net income | $ 0.42 | | | $ 0.63 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,251 | | | 12,251 |
| Diluted | 12,881 | | | 12,881 |

- 15 -

# PCM, INC.
## Unaudited Pro Forma Combined Statement of Operations
## For the Three Months Ended March 31, 2015
## (In Thousands)

| | PCM Three Months Ended March 31, 2015 | En Pointe Three Months Ended December 31, 2014 | Pro Forma Adjustments | Pro Forma Combined Three Months Ended March 31, 2015 |
|---|---|---|---|---|
| Net sales | $ 295,959 | $ 107,699 | | $ 403,658 |
| Cost of goods sold | 256,854 | 92,389 | | 349,243 |
| Gross profit | 39,105 | 15,310 | | 54,415 |
| Selling, general and administrative expenses | 44,312 | 13,728 | $ 337(n) | 58,377 |
| Operating profit (loss) | (5,207) | 1,582 | (337) | (3,962) |
| Interest expense, net | 771 | 113 | 82(o) | 966 |
| Income (loss) from continuing operations before income taxes | (5,978) | 1,469 | (419) | (4,928) |
| Income tax expense (benefit) | (2,454) | 363 | 68(q) | (2,023) |
| Income (loss) from continuing operations | (3,524) | 1,106 | (487) | (2,905) |
| Loss from discontinued operations, net of taxes | (31) | — | — | (31) |
| Net income (loss) | $ (3,555) | $ 1,106 | $ (487) | $ (2,936) |
| **Basic and Diluted Loss Per Common Share** | | | | |
| Basic EPS: | | | | |
| Loss from continuing operations | $ (0.29) | | | $ (0.24) |
| Loss from discontinued operations, net of taxes | — | | | — |
| Net loss | $ (0.29) | | | $ (0.24) |
| Diluted EPS: | | | | |
| Loss from continuing operations | $ (0.29) | | | $ (0.24) |
| Loss from discontinued operations, net of taxes | — | | | — |
| Net loss | $ (0.29) | | | $ (0.24) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,230 | | | 12,230 |
| Diluted | 12,230 | | | 12,230 |

32.     Investors learned just how important the En Pointe acquisition was to PCM's bottom line, financial stability, and long-term prospects from the published financial statements and pro forma results.  En Pointe's net sales increased PCM's 2014

Class Action Complaint for Violation of the Federal Securities Laws

total net sales by a significant amount, 33%, and En Pointe's 2014 net income was actually *higher* than PCM's 2014 net income.[7]   More starkly, the pro forma results for the three months ending March 31, 2015, the last full quarter preceding the actual acquisition, show PCM with a net income *loss* of over $3.5 million, while En Pointe's net income for the final three months of 2014 showed a *profit* of over $1.1 million.

33.    In an exhibit to the June 17, 2015 8-K/A, under the heading "Pro Forma Adjustments," PCM stated that "Goodwill reflects the excess of the purchase price over the identified tangible and intangible assets."   In the Combined Pro Forma balance sheet as of March 31, 2015, PCM's goodwill (without En Pointe) was recorded at $25 million, but PCM recorded an additional $40 million in goodwill, solely attributable to En Pointe, an amount confirmed in PCM's 10-Q for the second quarter of 2015 ("2Q 2015 10-Q").   Similarly, the "net intangible assets" attributed to En Pointe, which includes the value of "customer relationships," "non-compete agreements," and "trademarks/tradenames," were recorded as over $8.2 million, the vast majority of which, $6.2 million, was attributed to "customer relationships" and "non-compete agreements."   En Pointe's intangible assets were valued at almost twice those of PCM.

---

[7] En Pointe's fiscal year ended on September 30, 2014.

Class Action Complaint for Violation of the Federal Securities Laws

*Ovex Technologies*

34.     Throughout the Class Period, PCM has kept from investors its and En Pointe's most important contractual relationship, keeping secret not only the details, and the acrimonious collapse of that relationship, but the very fact of the existence of a contractual relationship.

35.     Ovex is a Pakistani company with its principal place of business in Islamabad, Pakistan.  Ovex is Pakistan's largest business process outsourcer ("BPO"). According to a Complaint in a separate California lawsuit filed by En Pointe (after its acquisition by PCM),[8] and an Amended Answer and Counterclaims sought to be filed by PCM in the Delaware lawsuit,[9] Ovex was formed in 2003 by the entity now known as Collab9 and its majority owner, Bob Din, "for the purpose of establishing a captive supplier of services."  PCM admits that Ovex is still controlled and owned by parties related to Collab9 and Bob Din, who thus "exercise substantial control over Ovex."

36.     When PCM acquired En Pointe's assets, it inherited En Pointe's contract with Ovex.  The Ovex contract was not peripheral to PCM's acquisition of En Pointe; PCM, in litigation, describes the Ovex relationship and governing contract as "a key

---

[8] *See En Pointe Technologies Sales LLC v. Imran Yunus*, No. 30-2017-00904563-CU-BT-CJC (Orange Co., CA Feb. 22, 2017).

[9] *See Collab9, LLC v. En Pointe Technologies Sales, LLC and PCM, Inc.*, C.A. No. N16C-12-032 MMJ (Del. Sup. Ct. Dec. 5, 2016).

Class Action Complaint for Violation of the Federal Securities Laws

asset" of En Pointe and its services "mission-critical."  Ovex "maintains and operates" "PCM's information technology services" and "support and servicing of En Pointe's U.S. customers." Ovex is "an almost entirely captive service provider to" PCM, i.e., it "operates virtually exclusively for the benefit of" PCM.  It is Ovex employees who "develop and cultivate personal and professional relationships with decision-makers at PCM's and En Pointe's clients."

37.    This relationship means that PCM is similarly captive to Ovex.  PCM has admitted privately and in court filings, though not to investors, that Ovex "is the *de facto* custodian of the customer, financial and operational data that PCM acquired from Collab9," including "customer lists, customer and account purchasing information, information on business processes, efficiencies, and roles, business documents and templates, costs, pricing strategies, and pricing information," and "has the *unique* knowledge and skill necessary to access much of that data" (emphasis added).  PCM admits that the confidential information "would be invaluable to a competitor because a competitor could use that information to undercut En Pointe's pricing in a way that would otherwise be unavailable to it."  The services provided by Ovex are "essential to" PCM's operations, and PCM "cannot effectively gain access to and make use of significant portions of [its own] operational data other than through Ovex."  PCM has admitted, but has never informed investors, that "any disruption of or interference with the relationship between PCM and Ovex… threatens to cause severe and lasting harm

- 19 -

to the business."  This secrecy is *intentional*, as PCM admits that it keeps "even the existence of its relationship secret from third parties."

38.     In the proposed Amended Answer in the Delaware lawsuit, PCM admits that it knew of problems with Ovex's performance shortly after the acquisition.  Ovex and its employees ceased cooperating with En Pointe.  Supervisors copied confidential information onto external hard drives,[10] and almost the entire Ovex "Bid Team," comprised, in part, of eight Ovex managers, left Ovex and moved to Zones, Inc. ("Zones"), a direct competitor of En Pointe, taking with them En Pointe's trade secrets and other confidential information, and began soliciting En Pointe's customers to move to Zones.  "On multiple occasions," Ovex employees refused to provide PCM with its own confidential information.  In the California action, PCM has charged Ovex supervisors and other employees with breaching their non-compete agreements, and soliciting other Ovex employees to breach their non-compete employment agreements, agreements which PCM admits "protect its confidential and trade secret information, as well as its customer relationships."

39.     PCM admits that the Ovex breaches caused severe damage to PCM, and "prevented PCM from satisfactorily responding to customer inquiries, processing

---

[10] PCM claims that this specific action took place on approximately October 4, 2016.

Class Action Complaint for Violation of the Federal Securities Laws

internal and external transactions that draw on historical data, and otherwise conducting the Business in the manner contemplated by the APA."

40.    In its proposed Amended Answer in Delaware, PCM states that the materially false financials provided by Collab9 were "[c]ritical to PCM's assessment of the value of the Business – and hence the amount PCM was willing to pay for it," and that the "earning capacity and the value of the Business" were materially overstated.

41.    In the same proposed document, PCM states that Collab9's and Din's intentional actions, while in de facto control of Ovex, have "den[ied] PCM the benefit of the services Ovex is contractually obligated to perform for PCM," and that PCM cannot "operate the Business in the manner contemplated by the APA," and thus Collab9 has "diminish[ed] the value of [En Pointe] after the Closing."

42.    Investors never learned that Ovex had a contractual relationship with PCM and En Pointe, or that Bob Din, Collab9's majority owner, created Ovex, and that Din and Collab9 had *de facto* control over Ovex.  This information, however, was available to and known by Defendants.  PCM claims not to have known any of these facts, even as Bob Din is listed as the majority owner of Collab9 in the APA, and received $9 million as payment for the transfer of the "Din Goodwill" from Collab9 to PCM, 60% of the initial $15 million payment from PCM to Collab9, and even as Din founded Ovex in 2003 to service En Pointe.  In the Delaware litigation, but not in SEC filings

- 21 -

during the Class Period, PCM admits that it should not "and would not have agreed to purchase" En Pointe if "Ovex and its mission-critical services" were "under the *de facto* control of Collab9 and Din."

43. The name "Ovex" is never mentioned in any of PCM's public filings, either before or during the Class Period. Ovex is never mentioned in the APA, including in Section 6.7, "Material Contracts." Accordingly, the existence of the Ovex contract, the misuse and theft of PCM's trade secrets and confidential information, PCM's lack of access to its own information, the interference with PCM's and En Pointe's customer relationships, the disruption of "mission-critical services," and PCM's judgment that it should not have acquired En Pointe, were never related to investors during the Class Period.

***En Pointe's False Financials and the False Pro Forma Results***

44. Within months, at the latest, of the signing of the APA, Defendants knew, or were reckless in not knowing, that the En Pointe financial statements it published in the June 17, 2015 8-K materially overstated En Pointe's earnings by millions of dollars, that the economic loss to PCM was "far greater" than the millions of dollars, that the financial statements were not actually prepared in accordance with GAAP, and could not be relied upon. Nevertheless, during the Class Period, Defendants never restated the En Pointe financials or the pro forma results it published, never informed investors that the financials should not be relied upon, never wrote down the $40 million in

- 22 -

Class Action Complaint for Violation of the Federal Securities Laws

goodwill it recorded attributable to the En Pointe acquisition, never impaired the $8.2 million in intangible assets to recorded attributable to En Pointe, and never even hinted at issues with the En Pointe financial statements it included in the June 17, 2015 8-K/A.

45.     Privately, Defendants admit knowing that the En Pointe financials included in PCM's SEC filings were materially false.  In the Delaware lawsuit, filed by Collab9 on December 5, 2016 claiming underpayment of earn-out payments, PCM filed an Answer denying Collab9's charges, but offered no counterclaims.  On the same date, however, PCM's attorneys wrote a private, detailed letter to Collab9's counsel, laying bare PCM's knowledge of the falsity of the En Pointe financials, and claiming that Collab9 violated section 6.5 of the APA.  After explaining that PCM deliberately chose not to assert counterclaims in its Answer, for the purpose of perhaps resolving the matter without doing so (and thus hiding the fact of the false financials from investors forever), PCM stated that:

- The financial statements "materially overstate the EBITDA generated by" En Pointe";

- The financial statements fail to account for liabilities incurred by En Pointe, including "credits owed to customers for… overpayments, deposits, and returns";

Class Action Complaint for Violation of the Federal Securities Laws

- The EBIDTA overstatement relating to two customers, alone, exceeds $2 million;

- The financial statements "failed to account for substantial liabilities related to unredeemed credit earned by customers";

- The financial statements intentionally overstate EBIDTA through "manipulative accounting treatment of vendor rebates, earned fees, and amounts earned under vendor-sponsored promotional programs," and Collab9 used such rebates and payments to "understate the Business' costs of goods sold during the period covered by the Financial Statements," thus "mislead[ing PCM] about the true earning capacity of" En Pointe;

- The financial statements "misrepresent the value of inventory," and "understate the cost of goods sold";

- As a result, net income was at least "millions less than is reported in the Financial Statements."

46.     On March 9, 2017, in a response letter to PCM's counsel denying the charges, Collab9's attorney noted that though PCM had filed the financial statements with the SEC, "PCM has not retracted or restated any of those SEC filings." This fact remains true today.

47.     On March 16, 2017, PCM's attorney wrote back to Collab9, noting that any potential settlement negotiations were closed.  Following another letter from

Class Action Complaint for Violation of the Federal Securities Laws

Collab9's counsel, PCM, in a letter dated March 30, 2017, repeated every allegation, verbatim, from its February 8, 2017 letter.

48.     In the 2016 10-K, filed on March 9, 2017, long after PCM knew and admitted privately, in writing, that it knew the financials were materially false, PCM described the allegations brought by Collab9 in the Delaware lawsuit, but failed to mention any potential counterclaims, breaches of the APA by Collab9, or the falsity of the financial statements and pro forma results PCM itself filed with the SEC.

49.     On April 11, 2017, PCM filed a motion to amend its answer in the Collab9 lawsuit, attaching as exhibits its Proposed Amended Answer, and the correspondence cited above. [11]   Repeating the claims contained in the letters regarding material understatement of liabilities and overstatement of earnings, and blaming not only Collab9, but Bob Din specifically, the counterclaims added the following:

- The financial statements received and filed by PCM were "[c]ritical to PCM's assessment of the value of [En Pointe]";

- "The Financial Statements were not, in fact, prepared in accordance with GAAP" and "do not fairly and accurately present the financial condition of the Business and the results of its operations during the period covered by the Financial Statements";

---

[11] The court in the Delaware case has yet to rule on PCM's motion.

Class Action Complaint for Violation of the Federal Securities Laws

- "Collab9 knowingly misled PCM about the true earning capacity of the Business";

- En Pointe's "earnings during the period in question were millions of dollars less than is reported in the Financial Statements";

- "Had PCM known the truth about the Business' finances, it would not have entered into the Purchase Agreement";

- Because the sale price "was based on a multiple of earnings in the Financial Statements, the economic loss PCM has suffered as a result of Collab9's breach of Section 6.5 of the Purchase Agreement **is far greater than the amount by which earnings were overstated**" (emphasis added).

50.     Because investors were never told that the financial statements were materially false, they never learned, during the Class Period, that En Pointe's net earnings had actually been negative, and lagged behind even PCM's unimpressive results.  Nor did investors learn that PCM itself stated that its economic loss was "far greater" than those millions of dollars.

51.     During the Class Period, PCM never informed investors that the financial statements and pro forma results it filed with the SEC were materially false.

52.     During the Class Period, PCM never informed investors that the financial statements and pro forma results it filed with the SEC should not be relied upon.

Class Action Complaint for Violation of the Federal Securities Laws

53.     During the Class Period, or after, PCM never restated or corrected any financial statements or pro forma results.

54.     During the Class Period, and after, PCM never informed investors that the financial statements were not actually prepared in accordance with GAAP.

55.     During the Class Period, PCM never impaired the goodwill it attributed to the En Pointe purchase, despite PCM's knowledge that En Pointe's net income was "millions of dollars less than is reported in the Financial Statements," that its own economic loss was "far greater" than those millions, and that the Financial Statements were not prepared in accordance with GAAP, were so deficient that PCM stated that it would not have purchased the En Pointe assets if it knew En Pointe's true financial condition, and that Ovex was destroying PCM's relationships with its customers.  In fact, PCM created the impression that there was nothing wrong with the financial statements or the $40 million in goodwill attributable to En Pointe it had recorded, writing in both the 2016 10-K,[12] after PCM had admitted, privately, the falsity of the financial statements, in the 2015 10-K, filed March 15, 2016,[13] and in every quarterly report during the Class Period that "[w]e performed our annual impairment analysis of

---

[12] The 2016 10-K was signed by the Individual Defendants, who also each signed SOX Certifications.

[13] The 2015 10-K was signed by the Individual Defendants, who also each signed SOX Certifications.

Class Action Complaint for Violation of the Federal Securities Laws

goodwill and indefinite-lived intangible assets for possible impairment as of October 1…. [and] [a]s a result of our annual impairment analysis as of October 1… we have determined that no impairment of goodwill and other indefinite-lived intangible assets existed."

56.    Similarly, during the Class Period PCM never impaired the intangible assets it attributed to En Pointe, despite PCM's knowledge of all of the facts described in detail above, and that virtually all of the $8.2 million in intangible assets attributed to En Pointe was due to "non-compete agreements" and "customer relationships," both of which Ovex had left in tatters.  As with goodwill, PCM created the impression that there was nothing wrong with the financial statements or the $8.2 million in intangible assets attributable to En Pointe it had recorded, writing in both the 2016 10-K and in the 2015 10-K, and in every quarterly report during the Class Period that "We performed our annual impairment analysis of goodwill and indefinite-lived intangible assets for possible impairment as of October 1…. [and] [a]s a result of our annual impairment analysis as of October 1… we have determined that no impairment of goodwill and other indefinite-lived intangible assets existed."

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

57.    The June 17, 2015 8-K/A included:

- En Pointe's audited annual financial statements for the fiscal years ending September 30 of 2012, 2013, and 2014, including balance sheets,

Class Action Complaint for Violation of the Federal Securities Laws

statements of income and comprehensive income, and statements of cash flow;

- En Pointe's unaudited balance sheets as of December 31, 2014 and September 30, 2014, unaudited condensed statements of income and comprehensive income for the three months ending December 31, 2014 and December 31, 2013, and unaudited condensed statements of cash flow for the three months ending December 31, 2014 and December 31, 2013;

- The unaudited pro forma combined balance sheet of PCM as of March 31, 2015, the unaudited pro forma combined statement of operations for the year ended December 31, 2014, and the unaudited pro forma combined statement of operations for the three months ended March 31, 2015, all of which incorporated the En Pointe financials.

Among the financial statements and pro forma results included were:

Class Action Complaint for Violation of the Federal Securities Laws

**EN POINTE TECHNOLOGIES SALES, INC.**
**STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**FOR THE YEARS ENDED SEPTEMBER 30, 2014, 2013 AND 2012**
**(in Thousands)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2014** | **2013** | **2012** |
| Net sales: | | | |
| Product | $ 375,578 | $ 306,614 | $ 295,206 |
| Service | 17,001 | 14,904 | 15,519 |
| Total net sales | 392,579 | 321,518 | 310,725 |
| Cost of sales: | | | |
| Product | 325,234 | 262,182 | 254,697 |
| Service | 8,677 | 9,406 | 9,677 |
| Total cost of sales | 333,911 | 271,588 | 264,374 |
| Gross profit: | | | |
| Product | 50,344 | 44,432 | 40,509 |
| Service | 8,324 | 5,498 | 5,842 |
| Total gross profit | 58,668 | 49,930 | 46,351 |
| Operating expenses: | | | |
| Selling and marketing expenses | 46,449 | 40,667 | 36,014 |
| General and administrative expenses | 6,906 | 6,519 | 6,659 |
| Operating income | 5,313 | 2,744 | 3,678 |
| Other (expense) income: | | | |
| Interest expense, net | (577) | (539) | (710) |
| Other income (expense), net | 1,658 | 80 | 95 |
| Total other income (expense), net | 1,081 | (459) | (615) |
| Income from continuing operations before provision for income taxes | 6,394 | 2,285 | 3,063 |
| Provision for income taxes | 393 | 60 | 943 |
| Net income from continuing operations | 6,001 | 2,225 | 2,120 |
| Loss from discontinued operations, net of tax | — | — | (1,346) |
| Net income | 6,001 | 2,225 | 774 |
| Other comprehensive income (loss), net of tax | | | |
| Valuation adjustment for equity positions | 24 | (219) | (160) |
| Comprehensive income | $ 6,025 | $ 2,006 | $ 614 |

- 30 -

Class Action Complaint for Violation of the Federal Securities Laws

# PCM, INC.
## Unaudited Pro Forma Combined Statement of Operations
## For the Year Ended December 31, 2014
### (In Thousands)

| | PCM FYE December 31, 2014 | En Pointe FYE September 30, 2014 | Pro Forma Adjustments | Pro Forma Combined FYE December 31, 2014 |
|---|---|---|---|---|
| Net sales | $ 1,356,362 | $ 392,579 | | $ 1,748,941 |
| Cost of goods sold | 1,164,295 | 333,911 | | 1,498,206 |
| Gross profit | 192,067 | 58,668 | | 250,735 |
| Selling, general and administrative expenses | 176,362 | 51,697 | $ 1,347(n) | 229,406 |
| Operating profit | 15,705 | 6,971 | (1,347) | 21,329 |
| Interest expense, net | 3,180 | 577 | 329(o) | 4,086 |
| Income from continuing operations before income taxes | 12,525 | 6,394 | (1,676) | 17,243 |
| Income tax expense | 5,490 | 393 | 1,675(p) | 7,558 |
| Income from continuing operations | 7,035 | 6,001 | (3,351) | 9,685 |
| Loss from discontinued operations, net of taxes | (1,570) | — | — | (1,570) |
| Net income | $ 5,465 | $ 6,001 | $ (3,351) | $ 8,115 |
| **Basic and Diluted Earnings (Loss) Per Common Share** | | | | |
| Basic EPS: | | | | |
| Income from continuing operations | $ 0.57 | | | $ 0.79 |
| Loss from discontinued operations, net of taxes | (0.12) | | | (0.13) |
| Net income | $ 0.45 | | | $ 0.66 |
| Diluted EPS: | | | | |
| Income from continuing operations | $ 0.55 | | | $ 0.75 |
| Loss from discontinued operations, net of taxes | (0.13) | | | (0.12) |
| Net income | $ 0.42 | | | $ 0.63 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,251 | | | 12,251 |
| Diluted | 12,881 | | | 12,881 |

Class Action Complaint for Violation of the Federal Securities Laws

**PCM, INC.**
**Unaudited Pro Forma Combined Statement of Operations**
**For the Three Months Ended March 31, 2015**
**(In Thousands)**

| | PCM Three Months Ended March 31, 2015 | En Pointe Three Months Ended December 31, 2014 | Pro Forma Adjustments | Pro Forma Combined Three Months Ended March 31, 2015 |
|---|---|---|---|---|
| Net sales | $ 295,959 | $ 107,699 | | $ 403,658 |
| Cost of goods sold | 256,854 | 92,389 | | 349,243 |
| Gross profit | 39,105 | 15,310 | | 54,415 |
| Selling, general and administrative expenses | 44,312 | 13,728 | $ 337(n) | 58,377 |
| Operating profit (loss) | (5,207) | 1,582 | (337) | (3,962) |
| Interest expense, net | 771 | 113 | 82(o) | 966 |
| Income (loss) from continuing operations before income taxes | (5,978) | 1,469 | (419) | (4,928) |
| Income tax expense (benefit) | (2,454) | 363 | 68(q) | (2,023) |
| Income (loss) from continuing operations | (3,524) | 1,106 | (487) | (2,905) |
| Loss from discontinued operations, net of taxes | (31) | — | — | (31) |
| Net income (loss) | $ (3,555) | $ 1,106 | $ (487) | $ (2,936) |
| **Basic and Diluted Loss Per Common Share** | | | | |
| Basic EPS: | | | | |
| Loss from continuing operations | $ (0.29) | | | $ (0.24) |
| Loss from discontinued operations, net of taxes | — | | | — |
| Net loss | $ (0.29) | | | $ (0.24) |
| Diluted EPS: | | | | |
| Loss from continuing operations | $ (0.29) | | | $ (0.24) |
| Loss from discontinued operations, net of taxes | — | | | — |
| Net loss | $ (0.29) | | | $ (0.24) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,230 | | | 12,230 |
| Diluted | 12,230 | | | 12,230 |

58.     Defendants have *admitted* that the financial statements and pro forma results published with the June 17, 2015 8-K were materially false.  Defendants have stated, in filings in other lawsuits and in private correspondence by their counsel, that

- 32 -

Class Action Complaint for Violation of the Federal Securities Laws

the En Pointe financials overstated earnings by millions of dollars, were not actually prepared in accordance with GAAP, and that because the sale price "was based on a multiple of earnings in the Financial Statements, the economic loss PCM has suffered… is far greater than the amount by which earnings were overstated." Defendants have stated that had they "known the truth about the Business' finances, [PCM] would not have entered into the Purchase Agreement" to acquire the En Pointe assets.

59.     Subsequent to the filing of the June 17, 2015 8-K, containing the materially false financial statements and pro forma results, PCM filed the following quarterly and annual statements during the Class Period, each of which contained financial statements and results:[14]

     a.  the 2Q 2015 10-Q, filed on August 10, 2015;[15]

     b.  the 3Q 2015 10-Q, filed on November 9, 2015;

     c.  the 2015 10-K, filed on March 15, 2016;

     d.  the 1Q 2016 10-Q, filed on May 6, 2016;

---

[14] Defendants Khulusi and LaVerne each signed Certifications for each filing, stating, in part, that each had reviewed the report at issue, and that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact….".  Defendants Khulusi and LaVerne further signed SOX Certifications appended to each of the filings.

[15] This date marks the start of the Class Period.

Class Action Complaint for Violation of the Federal Securities Laws

e.  the 2Q 2016 10-Q, filed on August 9, 2016;

f.  the 3Q 2016 10-Q, filed on November 9, 2016; and

g.  the 2016 10-K, filed on March 16, 2017.

60.   In each of the cited SEC filings, Defendants failed to disclose the falsity of the financial statements and pro forma results published in the June 17, 2015 8-K.

61.   In each of the cited SEC filings, Defendants failed to failed to inform investors that the financial statements and pro forma results published in the June 17, 2015 8-K/A should no longer be relied upon by investors, failed to restate or correct the false financial statements and pro forma results, and failed to retract the false financial statements and pro forma results.

62.   The foregoing SEC filings, beginning with the August 10, 2015 10-Q, were materially false and/or misleading because:

a.  As described in detail above and below, Defendants knew or recklessly disregarded and violated SEC Regulations by failing to inform investors that the financial statements and pro forma results in the June 17, 2015 8-K/A should no longer be relied upon;

b.  As described in detail above and below, Defendants knew or recklessly disregarded and violated SEC regulations by failing to amend the June 17, 2015 8-K/A by filing the corrected En Pointe financial statements and pro forma results;

- 34 -

c.   As described in detail above and below, Defendants knew or recklessly disregarded and violated SEC regulations and GAAP by failing to restate its June 17, 2015 8-K/A by filing the corrected En Pointe financial statements and pro forma results.

63.   On March 15, 2016, PCM filed its 2015 10-K with the SEC, signed by both of the Individual Defendants.  In the 2015 10-K the Company wrote:

> Goodwill and indefinite-lived intangible assets are carried at historical cost, subject to write-down, as needed, based upon an impairment analysis that we perform annually, or sooner if an event occurs or circumstances change that would more likely than not result in an impairment loss.
>
> We performed our annual impairment analysis of goodwill and indefinite-lived intangible assets for possible impairment as of October 1…. [and] [a]s a result of our annual impairment analysis as of October 1… we have determined that no impairment of goodwill and other indefinite-lived intangible assets existed."

64.   The language appears twice, first in a section entitled "Critical Accounting Policies and Estimates," and also in a section entitled "Goodwill and Intangible Assets."  In the financial statements included in the 2015 10-K, the Company did not impair goodwill or intangible assets.

65.   PCM published the identical statement in the following SEC-filed documents: the 2Q 2015 10-Q, filed on August 10, 2015; the 3Q 2015 10-Q, filed on November 9, 2015; the 2015 10-K, filed on March 15, 2016; the 1Q 2016 10-Q, filed

on May 6, 2016; the 2Q 2016 10-Q, filed on August 9, 2016; the 3Q 2016 10-Q, filed on November 9, 2016; and the 2016 10-K, filed on March 16, 2017.  In the financial statements included in each document, the Company did not impair goodwill or intangible assets.

66.    The foregoing statements concerning goodwill and intangible assets were false and/or misleading in each SEC filing because:

a.  As described in detail above and below, Defendants knew or recklessly disregarded and violated GAAP by failing to conduct an interim goodwill impairment analysis throughout the entire Class Period;

b.  As described in detail above and below, Defendants knew or recklessly disregarded and violated GAAP by failing to conduct the full two-step goodwill impairment analysis annually;

c.  As described in detail above and below, Defendants knew or recklessly disregarded and violated GAAP by failing to impair the $40 million if recorded as goodwill attributable to En Pointe;

d.  As described in detail above and below, Defendants knew or recklessly disregarded and violated GAAP by failing to impair the $1.9 million it recorded for the intangible asset of "non-compete agreements" attributable to En Pointe;

Class Action Complaint for Violation of the Federal Securities Laws

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

e.   As described in detail above and below, Defendants knew or recklessly disregarded and violated GAAP by failing to impair the $4.3 million it recorded for the intangible asset of "customer relationships" attributable to En Pointe.

67.   On March 15, 2016, PCM filed its 2015 10-K with the SEC. The 2015 10-K discusses "Risk Factors," where the Company identified "risks and uncertainties facing our business which are set forth below."  In a subsection entitled "Part of our business strategy includes the opportunistic acquisition of other companies, and we may have difficulties integrating acquired companies into our operations in a cost-effective manner, if at all," PCM identifies the specific risk that PCM "may have difficulties integrating acquired companies into our operations in a cost-effective manner, if at all…. [due to] changing relationships with customers, suppliers and strategic partners," and that "[t]hese challenges can be magnified as the size of the acquisition increases."

68.   PCM published the identical risk disclosure in the following SEC-filed documents: the 2Q 2015 10-Q, filed on August 10, 2015; the 3Q 2015 10-Q, filed on November 9, 2015; the 2015 10-K, filed on March 15, 2016; the 1Q 2016 10-Q, filed on May 6, 2016; the 2Q 2016 10-Q, filed on August 9, 2016; the 3Q 2016 10-Q, filed on November 9, 2016; and the 2016 10-K, filed on March 16, 2017.

Class Action Complaint for Violation of the Federal Securities Laws

69.     The foregoing risk disclosures were false and misleading in each cited SEC filing at the time each was made because, as described in detail above and below, Defendants knew or recklessly disregarded that the general risk factor published in each document had specifically materialized.  Defendants were duty bound, but failed, to disclose the specific risk to the Company, rendering the foregoing risk disclosures meaningless.  Defendants knew or recklessly disregarded that the actions of Ovex and its employees, En Pointe's and PCM's most important strategic and contractual partner, and PCM's largest and most important acquisition, had caused material difficulties in integrating En Pointe into PCM in a cost-effective manner, and materially damaged customer relationships.

70.     The 2015 10-K, in the "Risk Factors" section, in which the Company identified "risks and uncertainties facing our business which are set forth below," warned generally in a sub-section entitled "If goodwill or intangible assets become impaired, we may be required to record a significant charge to earnings," that:

> The purchase price allocation for our historical acquisitions resulted in a material amount allocated to goodwill and intangible assets. In accordance with GAAP, we review our intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. We review the fair values of our goodwill and intangible assets with indefinite useful lives and test them for impairment annually or whenever events or changes in circumstances indicate an impairment may have occurred. Factors that may be considered a change in circumstances indicating that the carrying value of our goodwill or intangible

- 38 -

Class Action Complaint for Violation of the Federal Securities Laws

assets may not be recoverable include a decline in stock price and market capitalization, reduced future cash flow estimates, and slower growth rates in our industry. We may be required to record a significant non-cash charge to earnings in our consolidated financial statements during the period in which any impairment of our goodwill or intangible assets is determined, which could have a material adverse effect on our results of operations.

71.     PCM published the identical risk disclosure in the following SEC-filed documents during the Class Period: the 2015 10-K, filed on March 15, 2016; the 2Q 2015 10-Q, filed on August 10, 2015; the 3Q 2015 10-Q, filed on November 9, 2015; the 1Q 2016 10-Q, filed on May 6, 2016; the 2Q 2016 10-Q, filed on August 9, 2016; the 3Q 2016 10-Q, filed on November 9, 2016; and the 2016 10-K, filed on March 16, 2017.

72.     The foregoing risk disclosures were false and misleading in each cited SEC filing at the time each was made because, as described in detail above and below, Defendants knew or recklessly disregarded that because the general risk factor published in each document had specifically materialized, Defendants were duty bound, but failed, to disclose the specific risk to the Company, rendering the foregoing risk disclosures meaningless.  Defendants knew or recklessly disregarded that GAAP required PCM to impair the $40 million in goodwill it recorded attributable to En Pointe, impair the $1.9 million in intangible assets it recorded for "non-compete

Class Action Complaint for Violation of the Federal Securities Laws

agreements," and impair the $4.3 million in intangible assets it recorded for "customer relationships."

73.     On March 15, 2016, PCM filed its 2015 10-K with the SEC, signed by both of the Individual Defendants. Attached to the 10-K were Certifications from the Individual Defendants, stating, in part, that each had reviewed the report at issue, and that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact….".

74.     Identical Certifications were attached to the following SEC-filed documents: the 2015 10-K, filed on March 15, 2016; the 2Q 2015 10-Q, filed on August 10, 2015; the 3Q 2015 10-Q, filed on November 9, 2015; the 1Q 2016 10-Q, filed on May 6, 2016; the 2Q 2016 10-Q, filed on August 9, 2016; the 3Q 2016 10-Q, filed on November 9, 2016; and the 2016 10-K, filed on March 16, 2017.

75.     The foregoing Certifications were false and misleading for each cited SEC filing at the time each was made because, as described in detail above and below, Defendants knew or recklessly disregarded that each filing contained both untrue statements of fact and omitted to state material facts, and that:

    a.   SEC Regulations required the Company to inform investors that the financial statements and pro forma results in the June 17, 2015 8-K/A should no longer be relied upon;

Class Action Complaint for Violation of the Federal Securities Laws

b. SEC regulations required the Company to amend the June 17, 2015 8-K/A by filing the corrected En Pointe financial statements and pro forma results;

c. SEC regulations and GAAP required the Company to restate its June 17, 2015 8-K/A by filing the corrected En Pointe financial statements and pro forma results;

d. GAAP required the Company to impair the $40 million in goodwill it recorded attributable to En Pointe;

e. GAAP required the Company to impair the $1.9 million in intangible assets it recorded for "non-compete agreements"; and

f. GAAP required the Company to impair the $4.3 million in intangible assets it recorded for "customer relationships."

## **THE TRUTH EMERGES**

76. On May 2, 2017, an analyst writing under the name "Rota Fortunae,"[16] published an article on *SeekingAlpha.com* entitled, "Buyer's Remorse: Lawsuits Reveal Significant Risk With PCM's Largest Acquisition."

---

[16] In medieval and ancient philosophy, the Rota Fortunae," or "wheel of fortune," was spun by the goddess Fortuna to determine an individual's fate.

Class Action Complaint for Violation of the Federal Securities Laws

77.    The article revealed to investors, publicly, the falsity of the En Pointe financials filed by PCM with the SEC, and Ovex's material breaches of its contract with PCM.  Specifically, the article revealed:

- That PCM knew the filed financial statements were false, and withheld that information from investors;

- That the En Pointe financial statements filed by PCM with the SEC materially overstated the profitability of En Pointe, by millions of dollars, providing the same examples provided by PCM privately;

- That PCM alleges damages exceeding $57 million or over three times PCM's 2016 net income;

- That had PCM known the truth about En Pointe's finances, it would not have entered into the APA;

- The existence of Ovex to investors, and its importance to PCM's performance;

- Collab9's and Bob Din's control of Ovex, and their obstruction of PCM's and En Pointe's access to Ovex and to PCM's own "critical data," leaving PCM unable to conduct the business in a manner consistent with how it was historically conducted;

- That PCM knew about the Ovex issues, and withheld that information from investors;

- That Collab9's interference with Ovex's contract with PCM had damaged PCM's and En Pointe's goodwill with many of its customers.

- That En Pointe's expertise in "servicing its customers" actually "reside[s] at Ovex."

78.    On this news, shares of PCM fell $5.35 per share, or 22%, over the next two days, from $24.35 to $19.00, damaging investors.

79.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES AND REGULATIONS

### GAAP and SEC Rules and Regulations - Generally

80.    GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

81.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB").  A Statement of Financial Accounting Standards ("SFAS")

Class Action Complaint for Violation of the Federal Securities Laws

is a formal document issued by the FASB which details accounting standards and guidance of the FASB's accounting policies.  A SFAS is issued with the expectation that companies listed on a stock exchange in the United States will adhere to it.

82.    SEC rules and regulations require that publicly traded companies such as PCM include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X.

**PCM Violated SEC Regulations and GAAP by Failing to Inform Investors that the False Financial Statements Should No Longer be Relied Upon and Failing to Amend its June 17, 2015 8-K/A to Correct and Restate the False Financial Statements and Pro Forma Results**

83.    SEC Regulation S-X, §210.3-05 requires a company to file the financial statements of businesses acquired or to be acquired.

84.    SEC Regulation S-X, §210.11-01 requires a company to file pro forma financial information of the acquired business.

85.    SEC Regulation S-X, §4-01(a), 17 C.F.R. §210.4-01(a)(1), states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."

86.    The SEC's Form 8-K regulations, 17 C.F.R. §249.308, under "Information to be Included in the Report," Section 9 ("Financial Statements and

Exhibits"), Item 9.01 ("Financial Statements and Exhibits"), requires a company to file the financial statements of businesses acquired, and pro forma financial information, in a Form 8-K, both prepared pursuant to SEC Regulation S-X.

87.    The SEC's Form 8-K regulations, Section 4 ("Matters Related to Accountants and Financial Statements"), Item 4.02(a) ("Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review"), state that when a financial statement filed pursuant to SEC Regulation S-X "should no longer be relied upon because of an error in such financial statements as addressed in FASB Accounting Standards Codification ("ASC") Topic 250, "Accounting Changes and Error Corrections," a company must, within four (4) business days of discovery,[17] disclose "the date of conclusion of the non-reliance" and "a brief description of the facts underlying the conclusion."

88.    FASB ASC Topic 250, "Accounting Changes and Error Corrections," states that the process to revise previously issued financial statements to reflect correction of an error is a "restatement."  ASC 250 further dictates that "any error in… financial statements" discovered after issuance "**shall** be reported as an error correction" "by restating the… financial statements" (emphasis added).  ASC 250

---

[17] *See* the "General Instructions" of SEC Form 8-K regulations, 17 CFR 249.308, section (B) ("Events to be Reported and Time for Filing of Reports"), which applies to Sections 4 and 9.

- 45 -

further requires that when financial statements are restated to correct an error, "the entity shall disclose" that the "financial statements have been restated, along with a description of the error."

89.     As described in detail above, PCM knew, or recklessly failed to discover, within a short period of filing the June 17, 2015 8-K/A, that the En Pointe financial statements and the pro forma results were materially false, were not prepared in accordance with GAAP, and, as PCM admits in other forums, but not to investors, materially overstated both the value and earning capacity of En Pointe.

90.     PCM's failure to inform investors that the June 17, 2015 financial statements and pro forma results in the June 17, 2015 8-K/A should no longer be relied upon violated SEC Regulations.

91.     PCM's failure to amend its June 17, 2015 8-K/A by filing the corrected En Pointe financial statements and pro forma results violated SEC Regulations and GAAP.

**PCM Violated SEC Regulations and GAAP by Failing to Impair Goodwill**

92.     During the entire Class Period, Defendants violated GAAP by knowingly or recklessly failing to impair goodwill.

93.     ASC 350-20 addresses GAAP as it applies to financial accounting and reporting for goodwill.  Goodwill is defined as "an asset representing the future

- 46 -

economic benefits arising from other assets in a business combination.  ASC 350-20-20.

94.    Goodwill is tested for impairment at the reporting unit level.  ASC 350-20-20.

95.    PCM recorded $40 million in goodwill attributable to En Pointe in its Commercial Reporting Unit, according to the 2015 10-K.

96.    "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of goodwill exceeds its implied fair value."  ASC 350-20-35-2.

97.    Once a year, at the same time each year, a company must evaluate goodwill for impairment.  ASC 350-20-35-28.  It was PCM's policy to perform this evaluation as of October 1st of each year.

98.    However, "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount."  ASC 350-20-35-30.  A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis.  ASC 350-20-35-3.  The "totality" of events and circumstances, including a non-exclusive list of factors included in GAAP, must be evaluated.  ASC 350-20-35-3C, 3E.

99.    In the 2015 10-K and 2016 10-K, PCM states that it reviews its intangible assets when events or changes in circumstances indicate the carrying value of goodwill

- 47 -

may not be recoverable.  During the Class Period, the company never concluded that it was necessary to perform an interim test for impairment.

100.   PCM violated GAAP by knowingly or recklessly failing to consider obvious triggering events it admits existed, by failing to conclude that an interim goodwill impairment analysis was required, and by knowingly or recklessly failing to impair goodwill.

101.   Multiple triggering events were present, as described in detail above, and PCM admits their existence.  Defendants knew soon after the acquisition, or were reckless if they did not know, that the financial statements it published in the June 17, 2015 8-K/A were materially false and did not comply with GAAP.  PCM admits, though not to investors, that the materially false financials provided by Collab9 were "[c]ritical to PCM's assessment of the value of the Business – and hence the amount PCM was willing to pay for it," and that the "earning capacity and the value of the Business" were materially overstated.  In short, PCM did not receive what it thought it paid for, and the value which it had recorded for the assets based on the false financials was materially overstated.  Further, not long after the acquisition, Defendants knew, or were reckless if they did not know, of the deteriorating Ovex relationship, including denial of access to PCM's own confidential information, theft of confidential information, violation of non-compete agreements, solicitation of En Pointe employees to a competitor, their solicitation of En Pointe customers to that competitor, and

- 48 -

material breaches of non-compete agreements.  Ovex was responsible for developing, cultivating, and maintaining the personal and professional customer relationships for both En Pointe and PCM.  These triggering events would "more likely than not" negatively impact future costs, cash flows, revenues, along with the ability to retain its customers, all of which are on the non-exclusive list of factors to consider, *see* ASC 350-20-35-3C, and compel an interim goodwill analysis.  The only conclusion to draw from PCM's claim that no interim goodwill analysis was required is that the Company failed to even consider either the Ovex situation or the fact of the false financials in its evaluation, i.e., to consider publicly, and state to investors, what the Company admitted privately.

102.   The test for goodwill impairment is a two-step process.  Having failed, in violation of GAAP, to perform any interim analysis for goodwill impairment, PCM had no choice but to perform a test for goodwill impairment once a year.  ASC 350-20-35-28.  In the first step, the fair value of a reporting unit is compared to its carrying amount, also known as the net book value, including goodwill.  ASC 350-20-35-4.  If the carrying amount, recorded on the books, exceeds the fair value of the reporting unit, then goodwill is considered impaired and the second step of the impairment test is performed.  If the fair value of a reporting unit exceeds its carrying amount, goodwill is not impaired and the second step of the impairment test is unnecessary.  ASC 350-20-35-6 and 8.

- 49 -

Class Action Complaint for Violation of the Federal Securities Laws

103.   In every quarterly and annual report during the Class Period, PCM wrote that it performed the first step in the test, found no impairment, and did not move on to the second step, stating that "[w]e performed our annual impairment analysis of goodwill and indefinite-lived intangible assets for possible impairment as of October 1…. [and] [a]s a result of our annual impairment analysis as of October 1… we have determined that no impairment of goodwill and other indefinite-lived intangible assets existed."

104.   Defendants violated GAAP by knowingly or recklessly failing to conclude that the carrying amount of the reporting unit exceeded its fair value, by failing to proceed to the second step of the impairment test, and by knowingly or recklessly failing to impair goodwill.

105.   In the 2015 10-K, PCM states, among other things, that it determined the fair value of a reporting unit based on estimated future cash flows, future revenue growth rates and operating margins.  Again, however, PCM failed to consider publicly what it admitted privately.  PCM admitted, as described in detail above, that En Pointe's earning capacity and business value were materially overstated, both of which directly affect future cash flows.  Thus, PCM admits that the carrying amount of the En Pointe assets materially exceeded the fair value of those assets.  Alone, this compels PCM to conclude that an impairment exists and advance to the second step of the impairment test.  This conclusion is strengthened by the facts of PCM's troubles with

Class Action Complaint for Violation of the Federal Securities Laws

Ovex, as described in detail above.  The Ovex issues during the Class Period damaged customer relationships, increased IT costs, would lower future revenues, and increase costs substantially in future years as PCM would be required to replace its own confidential operational and financial data, to which Ovex was denying it access. Future revenue growth and operating margins would be negatively impacted by all of these issues, further reducing fair value.

106.   The second step of the two-step process, which PCM never conducted during the Class Period, is to determine the amount of impairment.  PCM should have subtracted the "implied value of goodwill" (which is the previously calculated fair value of the reporting unit minus the assigned value of tangible and intangible assets other than goodwill and liabilities) from the carrying amount of goodwill, which in this case was $40 million.  The difference is the amount of goodwill impairment.  ASC 350-20-35-9, 10, 16.  As described in detail above, the Ovex issues and overvaluation of the En Pointe assets caused the fair value of its goodwill to be significantly lower than the $40 million in goodwill recorded in PCM's books, and PCM was required to impair goodwill.

107.   PCM violated GAAP by knowingly or recklessly failing to perform the second step of the goodwill impairment test, failing completely to consider the false financials and Ovex problems in its goodwill evaluation process, and by knowingly or recklessly failing to impair goodwill.

Class Action Complaint for Violation of the Federal Securities Laws

**PCM Violated SEC Regulations and GAAP by Failing to Impair Intangible Assets**

108.   During the Class Period, Defendants knowingly or recklessly violated GAAP by failing to impair its intangible assets.

109.   PCM recorded $8.2 million in "intangible assets" attributable to En Pointe, $6.2 million of which were attributable to "customer relationships" ($4.3 million) and "non-compete agreements" ($1.9 million).  These valuations were based on the false En Pointe financials filed with the June 17, 2015 8-K/A, which Defendants admit materially overvalued the En Pointe assets and materially overstated En Pointe's earning capacity.

110.   The process for impairing "customer relationships" differs from the process for impairing "non-compete agreements."   Non-compete agreements are considered "Indefinite Lived Intangible Assets," while customer relationships are considered "Definite Lived Intangible Assets" or "Intangible Assets Subject to Amortization."

111.   With respect to non-compete agreements, as with goodwill, GAAP requires an annual test for impairment, and interim tests if it is "more likely than not" that the asset is impaired.  ASC 350-30-35-18.

112.   GAAP provides a non-exclusive list of qualitative factors for use in deciding whether to undertake an interim assessment.  ASC 350-30-35-18B.

- 52 -

113.   As with goodwill, several of these factors apply to PCM, including "the negative effect of future expected earnings and cash flow," "contractual… business or other factors," and "changes in… customers."   ASC 350-30-35-18B.   Further, the company was required to consider "other relevant events and circumstances that could affect the significant inputs used to determine the fair value."   ASC 350-30-35-18C.

114.   Defendants violated GAAP by failing to conduct an interim impairment analysis and proceed to a full impairment analysis.   Defendants knew, or were reckless in not knowing, that Collab9 and Bob Din were influencing Ovex supervisors and employees, who were violating their non-compete agreements, taking jobs at competitor Zones, soliciting other Ovex employees to violate their non-compete agreements, and soliciting PCM's customers to leave PCM and hire Zones.   Defendants filed a lawsuit in California state court charging an Ovex supervisor with violating his non-compete agreement and inducing others to do so.

115.   The actual impairment analysis requires a quantitative analysis of non-compete agreements, comparing the fair value of the intangible asset with its carrying value.   PCM recorded non-compete agreements at a value of $1.9 million, based on the false, materially overstated financial statements provided by Collab9.   Thus, carrying value exceeded fair value even before considering that PCM's non-compete agreements were being violated by many Ovex employees, were not serving to protect Ovex employees from stealing confidential information and taking it to En Pointe's

- 53 -

competitors, and that PCM believed its only recourse, all other steps having failed, was to file a lawsuit.  As with goodwill, if the negative information was considered in the impairment analysis, an impairment loss related to non-compete agreements would be required, and Defendants violated GAAP, knowingly or recklessly, by failing to impair the $1.9 million it recorded for the intangible asset of "non-compete agreements."

116.   With respect to "customer relationships," which PCM booked at a value of $4.3 million, PCM similarly violated GAAP by failing to conduct an impairment analysis, and failing to impair the asset.

117.   As with goodwill, an impairment analysis for customer relationships must be conducted if there is a triggering event.  GAAP provides a non-exclusive list of the types of issues considered triggering events.  ASC 360-10-35-21.  Here, the fact that En Pointe's financials materially overstated the value and earning capacity of PCM and were not prepared in accordance with GAAP, and the circumstances of the Ovex relationship, in which Ovex employees were impairing PCM's customer relationships, and attempting to lure customers away, and preventing PCM and En Pointe from accessing their own confidential information related to their customers, were triggering events requiring an impairment analysis.

118.   The impairment analysis for customer relationships is a two-step process. The first step compares the carrying value of the asset, here $4.3 million, with the undiscounted cash flows expected to result from the use and eventual disposition of the

asset.  ASC 360-10-35-17.  If the carrying amount is higher, the asset is not recoverable, an impairment is necessary, and the company must proceed to the second step.

119.   As described in detail above, PCM has admitted that the false financials, on which it based the valuation of En Pointe as a whole and the value of its assets, including intangible assets, were not prepared in accordance with GAAP, materially overstated earnings by millions of dollars, and that PCM's economic loss was "far greater" than the millions of dollars in overstated earnings.  On top of these facts, interference with customer relationships by Ovex employees will negatively affect future cash flows.  PCM admits the severity of the damage Ovex caused, writing that Ovex's breaches "prevented PCM from satisfactorily responding to customer inquiries, processing internal and external transactions that draw on historical data, and otherwise conducting the Business in the manner contemplated by the APA."  PCM was required to proceed to the second step of the impairment analysis.  Defendants violated GAAP, knowingly or recklessly, by failing to do so, or to impair the amount recorded as an intangible asset for customer relationships.

120.   The second step of the impairment analysis involves determining the amount of the required impairment by comparing the carrying amount, $4.3 million, with the discounted future cash flows.  ASC 360-10-35-17.  The difference is the impairment amount.  For the same reasons as were described above in detail, the facts of the materially overstated false financial statements, not prepared in accordance with

- 55 -

GAAP, and the facts of the Ovex relationship, including interference with both En Pointe's and PCM's customer relationships, relationships which Ovex employees were supposed to be servicing with PCM's confidential information, when in fact they were using that confidential information against PCM's interests, should have led PCM to impair the recorded amount of its customer relationships.

121. Defendants violated GAAP and filed false and misleading financial statements by failing, knowingly or recklessly, to impair the intangible asset of "customer relationships."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

122. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publically traded securities of PCM during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

123. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to

Class Action Complaint for Violation of the Federal Securities Laws

Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

124.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

125.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

126.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants' acts as alleged violated the federal securities laws;

(b)   whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of PCM;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused PCM to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of PCM's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

127.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

128.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

Class Action Complaint for Violation of the Federal Securities Laws

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities are traded in efficient markets;

(d)   the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)   the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)   Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

129.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

130.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of*

Class Action Complaint for Violation of the Federal Securities Laws

*the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>**NO SAFE HARBOR**</u>

131.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

<u>**COUNT I**</u>
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
<u>**Against All Defendants**</u>

132.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

Class Action Complaint for Violation of the Federal Securities Laws

134.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and omitted material facts.

135.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

136.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and omitted material information; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting

Class Action Complaint for Violation of the Federal Securities Laws

the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of PCM, the Individual Defendants had knowledge of the details of PCM's internal affairs.

137.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

138.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or on the integrity of the market price of the Company's securities during the Class Period in purchasing

Class Action Complaint for Violation of the Federal Securities Laws

the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements and omissions.

139.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

140.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

141.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

Class Action Complaint for Violation of the Federal Securities Laws

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

142.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of PCM's business affairs.   Because of their senior positions, they knew the adverse non-public information regarding the Company's financial position and business practices.

144.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by PCM which had become materially false or misleading.

145.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PCM disseminated in the marketplace during the Class Period.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PCM to engage in the wrongful acts complained of herein.   The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity,

Class Action Complaint for Violation of the Federal Securities Laws

they participated in the unlawful conduct alleged which artificially inflated the market price of PCM's securities.

146.   Each of the Individual Defendants, therefore, acted as a controlling person of PCM.  By reason of their senior management positions and/or being directors of PCM, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause PCM to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of PCM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

147.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 8, 2017          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

By: /s/ Gonen Haklay
Gonen Haklay, *pro hac vice*
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: ghaklay@rosenlegal.com

Class Action Complaint for Violation of the Federal Securities Laws

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lead Counsel for Lead Plaintiffs and the Class*

Class Action Complaint for Violation of the Federal Securities Laws

1

## <u>CERTIFICATE OF SERVICE</u>

2

   I hereby certify that on September 8, 2017, I electronically filed the foregoing

3

*Amended Class Action Complaint for Violation of the Federal Securities Laws* with

4

5

the Clerk of Court using the CM/ECF system, which will send notification of such to

6

all CM/ECF participants.

7

8
                                         **THE ROSEN LAW FIRM, P.A.**

9
                                         By: /s/ *Gonen Haklay*

10
                                         Gonen Haklay
                                         101 Greenwood Avenue, Suite 440
11
                                         Jenkintown, PA  19046
12
                                         Telephone: (215) 600-2817
                                         Facsimile: (212) 202-3827
13
                                         E-M: ghaklay@rosenlegal.com

14

15
                                         ***Lead Counsel for Lead Plaintiffs and the***
                                         ***Class***
16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint for Violation of the Federal Securities Laws