| | |
|---|---|
| 1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP |
|   |   A Limited Liability Partnership |
| 2 |   Including Professional Corporations |
|   | JOHN P. STIGI III, Cal. Bar No. 208342 |
| 3 | jstigi@sheppardmullin.com |
|   | JOHN M. LANDRY, Cal. Bar No. 194374 |
| 4 | jlandry@sheppardmullin.com |
|   | BRIDGET J. RUSSELL, Cal. Bar No. 288107 |
| 5 | brussell@sheppardmullin.com |
|   | 1901 Avenue of the Stars, Suite 1600 |
| 6 | Los Angeles, California 90067-6055 |
|   | Telephone:   310.228.3700 |
| 7 | Facsimile:    310.228.3701 |
| 8 | Attorneys for PCM, INC., FRANK F. KHULUSI and BRANDON H. LAVERNE |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA MILLER, individually and on behalf of all others similarly situated, | Case No. 17-CV-03364-VAP-KS |
| Plaintiffs, | **SUPPLEMENTAL NOTICE OF RECENT AUTHORITY** |
| v. | The Hon. Virginia A. Phillips |
| PCM, INC., FRANK F. KHULUSI and BRANDON H. LAVERNE, | |
| Defendants. | |

SMRH:484878859.2        **SUPPLEMENTAL NOTICE OF RECENT AUTHORITY**

Defendants respectfully submit this Supplemental Notice of Recent Authority in support of their Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Violation of the Federal Securities Laws (Dkt. 32).

On December 1, 2017, the United States District Court for the Southern District of California (Curiel, J.), in *In re BofI Holding, Inc. Securities Litigation*, No. 3:15-cv-02324-GPC-KSC, 2017 U.S. Dist. LEXIS 198153 (S.D. Cal. Dec. 1, 2017) (a copy is attached as exhibit A),[1] granted defendants' motion for judgment on the pleadings dismissing (with leave to amend) a Section 10(b) and Rule 10b-5 securities class action due to lead plaintiff's failure to plead loss causation. In granting the motion, the Court identified the circumstances under which a *Seeking Alpha* blog post which merely "repackaged" already-public information might constitute a "corrective disclosure." Applying Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, the Court held that to survive dismissal for failure to plead loss causation, the complaint must contain facts explaining *why* the concededly efficient market failed to appreciate the already-public information described in the *Seeking Alpha* blog post. *See id.* at *23-27. The Court held that lead plaintiff's failure to plead such facts (among other things) required dismissal of the securities class action complaint.

Dated: December 6. 2017    SHEPPARD. MULLIN. RICHTER & HAMPTON LLP

By   */s/ John P. Stigi III*
JOHN P. STIGI III
JOHN M. LANDRY
BRIDGET J. RUSSELL
Attorneys for Defendants
PCM, INC., FRANK F. KHULUSI and
BRANDON H. LAVERNE

---

[1] The district court's opinion is not in WestLaw's database at this time.

# EXHIBIT A

No *Shepard's* Signal™
As of: December 5, 2017 12:28 AM Z

# *In re BofI Holding, Inc. Secs. Litig.*

United States District Court for the Southern District of California

December 1, 2017, Decided; December 1, 2017, Filed

Case No.: 3:15-cv-02324-GPC-KSC

**Reporter**
2017 U.S. Dist. LEXIS 198153 *

IN RE *BofI* HOLDING, INC. SECURITIES LITIGATION,

## Core Terms

disclosure, allegations, corrective, loans, misrepresentations, articles, infrastructure, audit, causation, underwriting, Investments, lending, asserts, falsity, internal control, undisclosed, internal quotation marks, investigations, securities, related parties, economic loss, disclose, auditor, reveals, public information, mortgage, publicly, records, stock price, aggregation

**Counsel:** [*1] For Paul J. Grinberg, Nicholas A. Mosich, James S. Argalas, Andrew J. Micheletti, Defendants: John P Stigi, III, LEAD ATTORNEY, Sheppard Mullin Richter & Hampton, Los Angeles, CA.

For Houston Municipal Employees Pension System, Plaintiff: Daniel P. Chiplock, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein LLP, New York, NY; Joy Kruse, Katherine Collinge Lubin, LEAD ATTORNEYS, Lieff Cabraser Heimann & Bernstein, San Francisco, CA; Michael Joseph Miarmi, LEAD ATTORNEY, PRO HAC VICE, Lieff Cabraser Heimann & Bernstein, New York, NY; Richard M Heimann, Lieff Cabraser Heimann and Bernstein LLP, San Francisco, CA.

For BofI Holding, Inc., Gregory Garrabrants, Defendants: Alejandro E. Moreno, LEAD ATTORNEY, Sheppard, Mullin, Richter & Hampton, LLP, San Diego, CA; John P Stigi, III, LEAD ATTORNEY, Sheppard Mullin Richter & Hampton, Los Angeles, CA.

For John Marco, Movant: Laurence M. Rosen, LEAD ATTORNEY, The Rosen Law Firm, P.A., Los Angeles, CA.

**Judges:** Hon. Gonzalo P. Curiel, United States District Judge.

**Opinion by:** Gonzalo P. Curiel

## Opinion

**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**[ECF No. 123]**

Before the Court is Defendants' motion for judgment on the pleadings. (ECF No. 123.) The motion [*2] is fully briefed. Lead Plaintiff ("Plaintiff") filed an opposition on November 3, 2017 (ECF No. 128), and Defendants filed a reply on November 10, 2017 (ECF No. 129). Because the operative complaint does not assert allegations sufficient to establish a relevant corrective disclosure of the falsity of Defendants' actionable misrepresentations, the Court GRANTS Defendants' motion, but also GRANTS Plaintiff leave to amend its complaint.

**I. Background**

Plaintiff filed its first Consolidated Amended Class Action Complaint (the "CAC") on April 11, 2016. (ECF No. 26.) On September 27, 2016, the Court issued an order granting in part and denying in part a motion to dismiss premised on the ground that the CAC's allegations did not meet the heightened pleading standards applicable to securities class actions. (ECF No. 64.) In that ruling, the Court rejected Defendants' challenges to Plaintiff's claims against Defendants BofI and Garrabrants, but granted dismissal of Plaintiff's claims against Defendants Micheletti, Grinberg, Mosich, and Argalas.

On November 25, 2016, Plaintiff filed a Second

Amended Class Action Complaint (the "SAC"), which added allegations relevant to its *Section 20(a)* claims against Defendants **[\*3]** Micheletti, Grinberg, Mosich, and Argalas. (ECF No. 79.) Defendants again moved to dismiss. (ECF No. 88.) The Court again granted in part and denied in part. (ECF No. 113.) The Court found the new allegations sufficient to support plausible *Section 20(a)* claims against all Defendants. (*Id.* at 30-59.) The Court revisited its previous analysis with respect to Plaintiff's *Section 10(b)* claims against Defendants BofI and Garrabrants, and concluded that Plaintiff's allegations stated plausible securities fraud claims only with respect to BofI and Garrabrants's statements about (1) BofI's loan underwriting standards and (2) internal controls and compliance infrastructure. (*Id.* at 12-24.) The Court dismissed Plaintiff's *Section 10(b)* claims to the extent that they were premised on BofI and Garrabrants's alleged misrepresentations about BofI's allowance for loan losses ("ALL"), net income and diluted shares, loan-to-value ("LTV") ratio, and lending partnerships. (*Id.* at 28-38.)

On September 23, 2017, Defendants filed the now-pending motion for judgment on the pleadings. (ECF No. 123.) Defendants' new theory is that the SAC does not contain sufficient allegations of loss causation. Defendants argue that the "corrective disclosures" relied upon by Plaintiff—the *Erhart* **[\*4]** whistleblower action and the related *New York Times* coverage, as well as a litany of articles about BofI published on the website *Seeking Alpha*—did not disclose the falsity of the actionable misrepresentations and were merely duplicative of publicly available information.

**II. Allegations of Corrective Disclosures**

To demonstrate that Defendants' misrepresentations about BofI's loan underwriting standards and internal controls and compliance infrastructure caused Plaintiff and economic loss,[1] the SAC relies on "a series of partial corrective disclosures, some by third parties and some by Defendants, beginning on or around August 28, 2015." (ECF No. 79 at 136.) The SAC points to the following events as "partial disclosures" of the falsity of BofI and Garrabrant's statements: an August 28, 2015 *Seeking Alpha* article suggesting that the SEC was investigating BofI, that BofI was doing business with a Russian company on the Office of Foreign Assets Control ("OFAC") list, that BofI was "potentially the subject of a whistleblower lawsuit, that BofI's lending standards and LTV were 'gimmicks,' and that BofI had overstated its earnings by under-reserving and funding high-risk brokered loans with **[\*5]** high-cost deposits" (*id.* at 116); a whistleblower lawsuit against BofI filed on October 13, 2015, *see Erhart v. BofI Holding, Inc.*, No. 3:15-cv-02287-BAS-NLS (S.D. Cal.), ECF No. 1 (the "*Erhart* Complaint") and a *New York Times* article describing the lawsuit (ECF No. 79 at 7); an October 29, 2015 *Seeking Alpha* article noting substantial differences between the transcript of a conference call that BofI submitted to the SEC and transcripts of the same call prepared by independent sources (*id.* at 126); a November 4, 2015 *Seeking Alpha* article providing "details of previously undisclosed related party loans BofI made to" several BofI officers and their family members on terms "far more favorable than those available to borrowers unaffiliated with BofI" (*id.*); a November 5, 2015 *Seeking Alpha* article noting that "recent filing in [BofI's] countersuit against Erhart reveal[ed] the existence of undisclosed subpoenas and non-public government investigations" (*id.*); a November 10, 2015, *Seeking Alpha* article stating that BofI was engaged in suspicious lending relationships with OnDeck, Quick Bridge, RCN, and BofI Properties, and that BofI's list of subsidiaries could not be located on the SEC's EDGAR system (*id.* at 127-28); a November **[\*6]** 18, 2015, *Seeking Alpha* article indicating that BofI had unlawfully employed an individual with felony convictions and issued two loans to this individual, even after he had filed for bankruptcy (*id.* at 128); a November 19, 2015 *Seeking Alpha* article asserting that nearly $300 million in "risky single-family lender finance loans BofI made to Center Street SPEs" were disguised as another type of loan (*id.*); a November 30, 2015 *Seeking Alpha* article alerting investors to the transcript of BofI's annual stockholder's meeting in which an officer made a clarification about Garrabrants's statements in response to Erhart's whistleblower suit (*id.* at 128-29); a December 8, 2015 *Seeking Alpha* article "confirming the lending relationship between BofI and Quick Bridge" and WCL Holdings by posting a copy of a UCC Financing Statement, and noting that BofI's failure to disclose these relationships "may be in violation of applicable accounting standards and that WCL may require consolidation" (*id.* at 129); a December 16, 2015 *Seeking Alpha* article about an internal auditing official's background (*id.* at 129-30); a January 6, 2016 *Seeking Alpha* discussing BofI's lending relationship with Propel Tax and noting that BofI made a mortgage loan to **[\*7]**

---

[1] The Court and parties are well aware of the allegations in this case. For a more comprehensive recitation of Plaintiff's allegations, the Court refers the reader to the Court's two previous rulings on prior motions to dismiss. (*See* ECF Nos. 64, 113.)

the same internal auditing official in March 2012, which "created a conflict of interest" (*id.*); a January 21, 2016 *Seeking Alpha* article revealing BofI's use of BofI Properties as a previously-undisclosed off-balance sheet special purpose entity ("SPE"), and that BofI's Chief Legal Officer created "three additional off-balance sheet SPEs to purchase lottery receivables" from his former employer (*id.* at 130); and a February 3, 2016 *Seeking Alpha* article reporting that despite its claims to be "branchless," BofI had opened a branch in Nevada (*id.*).

### III. Legal Standard

"*Rule 12(c)* is functionally identical to *Rule 12(b)(6)* and . . . the same standard of review applies to motions brought under either rule." *Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)* (internal quotation marks omitted). A few years ago the Ninth Circuit clarified that the heightened pleading standard set forth in *Federal Rule of Civil Procedure 9(b)* "applies to all elements of a securities fraud action, *including loss causation*." *Or. Pub. Empls. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 605 (9th Cir. 2014)* (emphasis added). To satisfy this pleading standard in the context of the loss causation element of a securities fraud claim, Plaintiff must allege the "who, what, where, when, and how" of its economic loss and its cause. *See Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)*; **[*8]** *Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)*. "Still, in analyzing the complaint's sufficiency, a court must accept as true the facts alleged in a well-pleaded complaint in the light most favorable to [the] non-moving party." *In re Banc of Cal. Secs. Litig., No. SACV 17-00118 AG (DFMx), 2017 U.S. Dist. LEXIS 145361, 2017 WL 3972456, at *2 (C.D. Cal. Sept. 6, 2017)*.

### IV. Discussion

#### A. Definition of "Corrective Disclosure"

A successful claim under *§ 10(b)* and *Rule 10b-5* proves six elements: "(1) a material misrepresentation or omission; (2) scienter (*i.e.*, a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation." *Loos v. Immersion Corp., 762 F.3d 880, 886-87 (9th Cir. 2014)*. To establish loss causation, it is insufficient to point merely to the fact that at the time the plaintiff purchased a security, the price was artificially inflated as a result of the defendant's misrepresentation. Rather, a plaintiff must show that the defendant's misrepresentations caused the plaintiff economic loss. *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342-46, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*; *Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 812, 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011)* (loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market **[*9]** price *also* caused a subsequent economic loss" (internal quotation marks omitted)). "In other words, the plaintiff must plausibly allege that the defendant's fraud was *revealed* to the market and *caused* the resulting losses." *Loos, 762 F.3d at 887* (internal quotation marks and citation omitted). "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a substantial cause." *In re Gilead Scis. Secs. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008)* (internal quotation marks omitted).

In the context of a fraud-on-the-market claim, the most familiar way to plead loss causation is through allegations that the defendant's misrepresentation was revealed through "'corrective disclosures' which caused the company's stock price to drop and investors to lose money." *Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016)*. While a corrective disclosure need not be "an outright admission of fraud to survive a motion to dismiss," the disclosure of "a mere 'risk' or 'potential' for fraud . . . is insufficient to establish loss causation." *Loos, 762 F.3d at 888-89* (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1064 (9th Cir. 2008))*.

A corrective disclosure must be relevant to the alleged misrepresentation at issue. *See, e.g., In re Oracle Corp. Sec. Litig., 627 F.3d 376, 392 (9th Cir. 2010)* ("[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent, **[*10]** as opposed to merely reports of the defendant's poor financial health generally."). In other words, "[t]o be corrective, the disclosure must relate back to the misrepresentation and not to some other negative information about the company." *Bonanno v. Cellular Biomedicine Grp., Inc., No. 15-cv-01795-WHO, 2016 U.S. Dist. LEXIS 119194, 2016 WL 4585753, at *3 (N.D. Cal. Sept. 2, 2016)* (internal quotation marks omitted);

see also *In re REMEC Inc. Sec. Litig., 702 F. Supp. 2d 1202, 1266-67 (S.D.Cal. 2010)* ("A 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market.").

A corrective disclosure need not be a singular event. A series of disclosures, when "viewed in tandem," may be adequate if "[t]he combined force of these statements . . . suggest that the market was alerted to" the relevant misrepresentations. *See Metzler, 540 F.3d at 1063 n.6, 1064 n.8*. The Court should ask whether a full disclosure of the defendant's misrepresentation has been made by "view[ing each] together with the totality of the other alleged partial disclosures." *Lloyd, 811 F.3d at 1210* (quoting *Pub. Empls. Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 324 (5th Cir. 2014))*.

Finally, a corrective disclosure must do just that—disclose. Normally, this means that the corrective disclosure must offer some piece of previously undisclosed information revealing the misrepresentation as false. *See In re Novatel Wireless Secs. Litig., 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011)* ("It stands to reason then that [a] disclosure that does not reveal anything **[*11]** new to the market is, by definition, not corrective." (internal quotation marks omitted)); *In re Maxim Integrated Prods., Inc. Secs. Litig., 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009)* ("[A] disclosure that does not reveal anything new to the market is, by definition, not corrective." (internal quotation marks omitted)). If the alleged disclosure is merely duplicative of a prior public disclosure of the same information, the market will already have incorporated that information into the stock price; thus, the later public discussion of that information would not cause the stockholders any loss. *See Bonanno, 2016 U.S. Dist. LEXIS 119194, 2016 WL 4585753, at *5* (aggregation of publicly-available information "cannot constitute new information because an efficient market would easily digest all public information without the need for [the aggregation] to regurgitate it first" (internal quotation marks omitted)). The Ninth Circuit has held, however, that a corrective disclosure may be adequate even if it relies solely on previously disclosed information so long as the new corrective disclosure brought to light an implication of the previously disclosed information of which the market was not aware. *See Gilead Scis., 536 F.3d at 1053-54*. For example, a discussion of public information may be adequate to support loss causation if it interprets "complex economic data understandable **[*12]** only through expert analysis [that was not previously] readily digestible by the marketplace." *Amedisys, 769 F.3d at 323*. By explaining the implications of these otherwise non-digestible data, this "interpretive corrective disclosure" reveals to the public *for the first time* information that impacts the value of the stock.

The discussion above reveals that the analysis of determining whether a corrective disclosure has been pled is highly fact-dependent. "[T]here is no requirement that a corrective disclosure take a particular form or be of a particular quality . . . . It is the exposure of the fraudulent representation that is the critical component of loss causation." *In re Bristol Myers Squibb Co. Secs. Litig., 586 F. Supp.2d 148, 165 (S.D.N.Y. 2008)* (internal quotation marks and citation omitted). Here, the basic question the Court must answer is the following: after the disclosures identified by Plaintiff were made, did the market become aware of Defendants' misrepresentations to the extent that BofI's stock price declined? If yes, Plaintiff has pled with particularity how Defendants' misrepresentations caused Plaintiff harm; if no, Plaintiff's allegations do not meet the pleading requirements.

### B. Sufficiency of the Identified Corrective Disclosures

Upon review of the *Erhart* Complaint and the **[*13]** various articles referred to in the SAC, the Court concludes that—even considering all of these documents together—the SAC fails to identifies a relevant corrective disclosure.

### i. The *Erhart* Complaint

The allegations in the *Erhart* Complaint are not relevant to BofI's loan underwriting standards. The only allegations remotely relevant to BofI's underwriting standards are those involving BofI's loans to foreign nationals in violation of the Bank Secrecy Act. But those allegations have nothing to say about BofI's loan underwriting standards because the *Erhart* Complaint does not discuss the foreign nationals' creditworthiness. At best, these allegations are relevant to whether BofI has complied with federal law. But as this Court explained in its most recent ruling on Defendants' second motion to dismiss, "the Court's analysis focuses, not on whether any specific violation of law was committed, but whether the Lead Plaintiff has identified public statements that were rendered false or misleading by the facts alleged in the complaint." (ECF No. 113 at 9.)

The *Erhart* Complaint does assert allegations relating to BofI's internal controls and compliance infrastructure. But a close examination [*14] of those allegations indicates that the allegations did not reveal to the public the fact that Garrabrants's statements relating to BofI's compliance infrastructure were false. As discussed in the prior ruling, the SAC alleges that Garrabrants falsely stated that BofI had made "significant investments in our overall compliance infrastructure," had "spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personal," and had "been beefing up our compliance teams." (*Id.* at 20.) The *Erhart* Complaint, by contrast, does not speak to whether BofI increased spending in its compliance office. *See Erhart*, No. 3:15-cv-02287-BAS-NLS, ECF No. 1.

The *Erhart* Complaint[2] alleges that BofI officers did the following while Erhart served as an internal auditor at BofI: instructed him to remove or shield from discovery any discussion of unlawful conduct that Erhart had noted in an audit report (*id.* at 4-5); falsified BofI's financial statements (*id.* at 5); failed to make timely contributions to BofI's employees' 401k accounts without notifying the Internal Revenue Service or Department of Labor (*id.* at 6); submitted to the auditing office a strategic plan with forged signatures of the Board of Directors ( [*15] *id.* at 6-7); maintained a too-concentrated deposit source (*id.* at 7); instructed Erhart never to put evidence of illegal conduct in writing (*id.*); falsely responded to an SEC subpoena requesting information about a specific account by indicating that BofI had no information about that account (*id.* at 8-9); falsely responded to a request by the Office of the Comptroller of the Currency (the "OCC") for information on bank accounts with no tax identification number by stating that BofI had no such accounts (*id.* at 9); falsely told the OCC that the bank had not received any correspondence or subpoenas from federal and state banking agencies and law enforcement (*id.* at 9-10); made undisclosed substantial loans to foreign nationals with serious criminal histories in violation of the Bank Secrecy Act's Anti-Money Laundering Rules (*id.* 10); altered auditing reports required by the Bank Secrecy Act's Quality Control requirements (*id.*); materially miscalculated the bank's allowance for loan and lease losses (*id.* at 10-11); created such a "nonexistent culture of compliance" that multiple members of the auditing offices left their jobs (*id.* at 11); removed negative findings in a Flood Disaster Protection Act audit before submitting it to the OCC (*id.*); "sanitized" a [*16] report later submitted to the OCC describing third party customers who were involved in BofI's Global Cash Card program by removing information suggesting that the customers were fake (*id.* at 11-12); and prevented members of the audit department from using email to communicate so as to prevent the creation of a "paper trail" (*id.* at 14). The complaint also alleges that BofI's largest consumer account was listed under Garrabrants's brother's name, and that Plaintiff suspected that the money in that account came from Garrabrants's rather than Garrabrants's brother. (*Id.* at 12-13.) Finally, the complaint alleges that Erhart's manager, John Ball, abruptly resigned on March 5, 2015, "after refusing an order from CEO Garrabrants to engage in what Ball reasonably viewed to be unlawful conduct to cover up the Bank's wrongdoing," and that after Ball resigned, an officer instructed the auditing department not to inform the OCC of Ball's resignation. (*Id.* at 14.)

None of these allegations suggest that the compliance office was understaffed or had not been "beefed up" during the relevant period. To be sure, the *Erhart* Complaint includes a laundry list of shocking misconduct that, if true, exposes BofI to extreme regulatory [*17] consequences. But that is not the focus of the Court's inquiry. What the Court must decide is whether the allegations in the *Erhart* Complaint indicate that BofI did not put an increased amount of money towards its compliance infrastructure. Erhart's assertion that there was a "nonexistent culture of compliance" at BofI probably comes the closest to doing so, but does not suggest that the compliance infrastructure was not sufficiently resourced; at best, it revealed the fact that the BofI officials did not care what internal auditors thought about the lawfulness of the bank's actions. According to the *Erhart* Complaint, it did not matter how well resourced the auditing and compliance structures at BofI were because bank officials were not interested in compliance.

In this sense, the allegations in the *Erhart* Complaint are unlike the confidential witnesses' assertions in the SAC, which, as the Court previously found, demonstrate the falsity of Garrbarants's statements. Garrabrants's statement that BofI was making significant investments

---

[2] Erhart has since filed a First Amended Complaint. *See Erhart*, No. 3:15-cv-02287-BAS-NLS, ECF No. 32. The relevant allegations in the First Amended Complaint do not differ materially from the original complaint. (*See* ECF No. 128 at 12 n.8 (Plaintiff indicating that Erhart's "first amended complaint contains the same information form the original complaint described in the SAC").)

in its compliance infrastructure was false in light of the confidential witnesses' statements that BofI's Third Party Risk Department team was "understaffed" **[*18]** during the relevant period, and that Garrabrants stated that the tombstone of one of the witnesses who was responsible for "developing bank staff" and "remediating regulatory issues" was going to read "died understaffed." (ECF No. 113 at 20-21.) As the Court stated, these assertions "render 'false or misleading' BofI's representations about *the investment and money it was spending on personnel to run its internal control departments*." (*Id.* at 21 (emphasis added).) The allegations in the *Erhart* Complaint, by contrast, focus not on BofI's level of resource investment in compliance infrastructure, but rather BofI officials' attitude towards compliance.

Applying *Rule 9(b)*'s particularity requirement, Erhart's allegations did not reveal to the public that Garrabrants's statements about growing BofI's compliance team were false. Because the *Erhart* Complaint is irrelevant to Garrabrants's allegedly false statements, it cannot serve even as a partial corrective disclosure.[3] And because the corresponding *New York Times* article that described Erhart's allegations simply repeats them without adding any additional information, *see* Peter Eavis, *Ex-Auditor Sues Bank of Internet*, N.Y. Times (Oct. 13, 2015), https://www.nytimes.com/2015/10/14/business/dealbook/ex-auditor-sues-bank-of-internet.html?_r=0 , that **[*19]** article also did not contribute to any corrective disclosure of Garrabrants's misrepresentations about the size of BofI's compliance team.

### ii. *Seeking Alpha* Articles

Some of the *Seeking Alpha* articles identified in the SAC are relevant to BofI's loan underwriting standards, others are relevant to BofI's compliance infrastructure, and some are not relevant to either. As discussed below, however, the SAC does not identify a sufficient corrective disclosure of the falsity of Garrabrant's statements about BofI's loan underwriting standards or its compliance infrastructure.

### a. Loan Underwriting Standards

---

[3] In light of the irrelevance of the *Erhart* Complaint, the Court need not resolve the parties' dispute over whether allegations asserted in a whistleblower complaint may serve as a partial disclosure in the first place.

The *Seeking Alpha* articles discussing BofI's loan underwriting standards cannot serve as a corrective disclosure because they did not reveal to the public for the first time the falsity of Garrabrants's statements that BofI had not sacrificed credit quality to increase origination.

The August 28, 2015 article written by "The Friendly Bear" states that, to "back up [the] claims" that BofI was engaging in high risk lending, the author "accessed public records and analyzed hundreds of BOFI's loans in detail," and after "por[ing] through hundreds of loans that BOFI has written over the past several years," the author concludes **[*20]** that BofI's loans "are anything BUT low-risk." (ECF No. 123-4 at 1-2.) In relevant part, the Friendly Bear writes that BofI's preferred loan clients are "home flippers and other speculators — a behavior that resulted in the failure of its 'predecessors' Indymac and Thornburg (i.e., allowing borrowers to borrow against existing properties, regardless of current lien status, in order to buy additional investment properties)," and that BofI was "[m]aking loans to individuals who are 'unsavory' in nature and hardly appear credit-worthy for multi-million dollar loans." (*Id.* at 3.) The article suggests that BofI is lending to individuals who cannot get a loan at their regular bank institution, and that county records demonstrate that BofI's on-balance sheet loans "are sourced through mortgage brokers." (*Id.*) The author concludes that BofI's 5% loans are "economically irrational" because by charging a higher interest rate, and BofI must be lending to individuals "with heaps of existing debt, tax liens, gambling debt, an inability to put more cash at closing, or a history of bankruptcy/foreclosure." (*Id.* at 3-4.)

The November 10, 2015 article authored by "Aurelius" notes that while "the soundness of BOFI's mortgage **[*21]** lending practices have [recently] been questioned, . . . . [t]his writing attempts to shed light on an equally important piece of the mosaic. Sourced entirely from publicly available records, the article exposes how a network of boiler rooms, bad loans, and off-balance sheet maneuvers appears to have boosted BOFI's reported operating results while adding greatly to it's risk profile." (ECF No. 123-5 at 2.) The article discusses how BofI had "aggressively expanded" into commercial and industrial ("C&I") businesses, but notes that BofI "offers only limited disclosures" as to its activities, especially its C&I loans. (*Id.* at 2-3.) Aurelius writes that despite BofI's perceived success, "[a] search of public records . . . reveals that the courts have been flooded with collections and/or bankruptcy cases involving loans that BOFI has originated." (*Id.* at 3.)

Aurelius explains this contradiction by stating that "it appears" that lending partners such as OnDeck purchase loans originated by BofI. (*Id.* at 5.) Aurelius also discusses BofI's relationships with Quick Bridge (*id.* at 6-10), and the "potential existence" of off-balance-sheet SPEs (*id.* at 10-13). The article also indicates that BofI has partnered with "Rehab Cash Now," which advertises **[*22]** loans with no minimum credit score. (*Id.* at 13.) Finally, Aurelius notes that BofI has also engaged in structured settlement loans, citing recent public court documents, which he notes "hardly appears sustainable." (*Id.*)

The November 18, 2015 *Seeking Alpha* article written by "Real Talk Investments" indicates that BofI extended a $672,000 loan to an employee just one year after the employee filed for bankruptcy. Real Talk Investments, *Undisclosed Executive History May Be Final Blow for BOFI*, Seeking Alpha (Nov. 18, 2015), https://seekingalpha.com/article/3695396-undisclosed-executive-history-may-final-blow-bofi . A disclaimer at the bottom of the article states that it "is based upon information reasonably available to the author and obtained from public sources that the author believes are reliable." *Id.*

Aurelius's November 19, 2015 article asserts that despite the apparent safety of BofI's "large mortgage warehouse business," footnotes in BofI's SEC filings "reveal that $297 Million of far riskier lender-finance loans are disguised as belonging to this category." (ECF No. 123-6 at 1, 2.) Aurelius writes that Garrabrants's statement that BofI has "extremely disciplined credit standards, BofI appears to have directly contradicted his public statements by clandestinely funding 'hard **[*23]** money' single family lenders making higher suspect, 'fix & flip,' 'no doc,' 'no FICO,' 'no income verification,' type loans." (*Id.* at 1) Aurelius details—based on California public records—BofI's relationship with Center Street, and asserts that Center Street has been accused of "enabling and assisting" a Ponzi scheme. (*Id.* at 2-6.)

Similarly, Aurelius's December 8, 2015 article discusses BofI's lending partnerships and the fact that BofI had failed to disclose its "subsidiary list." (ECF No. 123-7 at 1.) From a California UCC database, Aurelius found evidence demonstrating that BofI was directly financing WCL Holdings. (*Id.* at 1-4.) Aurelius discusses how BofI "appears to be violating FASB accounting standards" because BofI failed to disclose this relationship. (*Id.* at 4-5, 7.) Aurelius also published an article on January 21, 2016, further discussing BofI's undisclosed off-balance-sheet dealings. (ECF No. 123-9.)

Defendants argue that these articles do not disclose any information about BofI's loan underwriting standards because they simply "repackage" existing public information. The Court agrees. The articles described above are quite similar to the corrective disclosure identified by the plaintiffs in *Bonanno*. There, the **[*24]** plaintiffs claimed that Defendants made misrepresentations about the relationship between the company and investor relation firms "to create positive spin through analyst coverage on its stock with the goal" of increasing the stock price. *Bonanno, 2016 U.S. Dist. LEXIS 119194, 2016 WL 4585753, at \*1*. The promoters disclosed payments from the company, but according to the plaintiffs the disclosures "were either buried behind so many links that a reasonable investor would never think they existed." *Id.* A year after this scheme began, a blogger on *Seeking Alpha* posted a 25 page article discussing the promotion campaign. *2016 U.S. Dist. LEXIS 119194, [WL] at \*2*. The day the article was published, the stock price decreased 21.7%. *Id.* The court dismissed the complaint, however, because the *Seeking Alpha* article did not reveal any previously undisclosed information about the promotion campaign. The court specifically rejected the plaintiffs' argument that the article was a corrective disclosure because it "revealed for the first time, in one place, the existence of the barrage of paid promotions, enabling the market to piece together the interrelatedness of the promoters." *2016 U.S. Dist. LEXIS 119194, [WL] at \*4*. As the court explained, "[a]lthough this colorful summary compiles several different examples of CBMG promotions, this aggregation **[*25]** does not constitute new information regarding the 'scope' of CBMG's campaign—it is simply an individual's summary and comments on publicly available facts. . . . This type of aggregation cannot constitute new information because an efficient market 'would easily digest' all public information 'without the need for [the analyst] to regurgitate it first.'" *Id.* (quoting *Meyer v. Greene, 710 F.3d 1189, 1198 n.9 (11th Cir. 2013))*.

The *Bonanno* court's discussion applies well to the several *Seeing Alpha* articles described above. Plaintiff does not dispute that every piece of information discussed and relied upon in the articles was obtained from public databases. Yet Plaintiff offers no reason to believe the market would not have appreciated the implications of that information prior to the "aggregation" offered by the *Seeking Alpha* articles. Plaintiff does not suggest that, for example, the information discussed in the *Seeking Alpha* articles constitute "complex economic data understandable only through expert analysis." *Amedisys, 769 F.3d at 323*; *see also In re*

*Herbalife, Ltd. Secs. Litig., No. CV 14-2850 DSF (JCGx), 2015 U.S. Dist. LEXIS 37109, 2015 WL 1245191, at *3 (C.D. Cal. Mar. 16, 2015)* (granting motion to dismiss because the complaint "provides no basis to conclude that Pershing's conclusions required expert analysis or that the underlying information was [*26] not available to the public"); *In re Blue Earth, Inc. Secs. Class Action Litig., No. CV 14-08263-DSF (JEMx), 2015 U.S. Dist. LEXIS 178032, 2015 WL 12001274, at *2 (C.D. Cal. Nov. 3, 2015)*. Instead, Plaintiff points to the sheer number of articles discussing BofI's wrongdoing. But the *Seeking Alpha* authors' prolificacy does not make an otherwise inadequate series of corrective disclosures sufficient. As this Court has previously noted, Plaintiff "mistakes quantity for quality." (ECF No. 113 at 30.) Because the *Seeking Alpha* articles do little more than aggregate publicly available information, the SAC fails to identify with particularity a corrective disclosure of the falsity of Garrabrants's statements regarding BofI's loan underwriting standards.

The Court finds Plaintiff's reliance on *Gilead Sciences*, and the decisions that stem from that opinion, unconvincing. (*See* ECF No. 128 at 16-17.) In *Gilead Sciences*, the FDA sent a warning letter to the company at issue chastising it for engaging in illegal off-label marketing of a drug. *Gilead Scis., 536 F.3d at 1052-53*. The market apparently did not appreciate the implications of the FDA letter because the stock price remained inflated until almost two months later, when the company issued a press release showing disappointing financial results. *Id. at 1054*. The court [*27] held that the complaint sufficiently alleged loss causation because it offered a plausible explanation for why the market did not appreciate the implications of the original disclosure of the FDA's warning letter. *Id. at 1056-57*. There, the plaintiffs asserted that "[t]he market was not told that off-label marketing was the cornerstone of demand," and the "mistaken impression of demand, led to, among other things, wholesaler overstocking in reaction to the anticipated price increase." *Id. at 1056*. Because this was a plausible explanation, the court held that the complaint's allegations as to loss causation were sufficient. *Id. at 1057*.

Here, while Plaintiff's opposition brief describes the content of the *Seeking Articles* in detail, it fails to explain *why* the market would not have appreciated the public information discussed in those articles. (*See* ECF No. 128 at 17-20.) That failure makes this case unlike *Gilead Sciences*, and dooms Plaintiff's claim. Without explaining why the market would not have appreciated the public information, Plaintiff exposes a serious internal contradiction within its fraud claim. To show reliance, Plaintiff invokes the efficiency of the market by asking the Court to presume that when Plaintiff purchased BofI stock, [*28] the market had digested all publicly available relevant information and incorporated that information into its pricing. *See, e.g., In re Diamond Foods, Inc. Secs. Litig., 295 F.R.D. 240, 247 (N.D. Cal. 2013)*. But to show loss causation, Plaintiff asks the Court to disregard that presumption. Without the benefit of a plausible reason to disregard the presumption in a particular context, the Court must assume that "[a]n efficient market for good news is [*also*] an efficient market for bad news." *In re Merck & Co., Inc. Secs. Litig., 432 F.3d 261, 271 (3d Cir. 2005)*.

Because these articles, even when considered together,[4] do not serve as a corrective disclosure of the falsity of Garrabrants's statements about BofI's loan underwriting standards, the SAC does not allege in a particularized manner that those misrepresentations caused Plaintiff economic loss.

### b. Internal Controls and Compliance Infrastructure

The Court also finds that the articles relevant to BofI's

---

[4] The Court notes that the SAC also refers to an August 22, 2015 *New York Times* article discussing the debate over whether BofI can sustain its growth through what many consider to be a risky business model. Peter Eavis, *An Internet Mortgage Provider Reaps the Rewards of Lending Boldly*, N.Y. Times (Aug. 22, 2015), https://www.nytimes.com/2015/08/23/business/a-internet-mortgage-provider-reaps-the-rewards-of-lending-boldly.html . It suggests that BofI "has lent money to some unsavory characters," and offers examples of investors who had been accused of Medicare and Medicaid fraud and erecting Ponzi schemes, as well as those "who have failed to pay loans made by other banks." It also notes that BofI made a $4.8 million loan to an individual who was currently being sued over a $3 million promissory note. But the SAC does not suggest—and Plaintiff does not argue in its briefing—that this article served as a corrective disclosure. The SAC refers to the article once, using it only to identify alleged misrepresentations made by Garrabrants by pointing to Garrabrants's statements quoted in the article. (*See* ECF No. 79 at 110-12 ("The statements attributable to Garrabrants in the August 2015 NY Times article concerning BofI's ethics, BofI's judiciousness in picking borrowers, BofI critics spreading disinformation, and BofI's foreign nationals program were false and misleading when made because . . .").)

internal controls and compliance infrastructure do not amount to a corrective disclosure of the falsity of Garrabrants's statements that BofI was "beefing up" its compliance team. As a result, the SAC fails to state a claim that misrepresentations in this context caused Plaintiff economic loss.

The [*29] October 29, 2015 *Seeking Alpha* article written by Aurelius notes "significant" differences between the transcript of the October 14 conference call that BofI sent to the SEC and the transcripts prepared by third parties. Real Talk Investments, *Buyer Beware: More Odd Behavior From BOFI*, Seeking Alpha (Oct. 29, 2015), https://seekingalpha.com/article/3620436-buyer-beware-odd-behavior-bofi . The differences noted in the article relate to whether the OCC was conducting an investigation into BofI, the largest deposit account at BofI, and why BofI switched external auditors "some years ago."

The November 4, 2015 article by Real Talk Investments reports that BofI "privately discussed" BofI's transcript alterations with an analyst in violation of a securities regulation, and may have falsely reported related party loans to the SEC. Real Talk Investments, *Buyer Beware: BOFI Related Party Loans*, Seeking Alpha (Nov. 4, 2015), https://seekingalpha.com/article/3641526-buyer-beware-bofi-related-party-loans . The article also asserts that BofI's related party loans "may suggest a culture of lax compliance at the Board level." *Id.* With respect to the investigation of Erhart's allegations, the author states, "from what I have seen, the company simply relied on an investigation conducted by some combination of Paul Grinberg (Chair of Audit Committee) [*30] and Eshel Bar-Adon (General Counsel)." *Id.* The author asserts that, "in my opinion," BofI's offering of advantageous related party loans creates a conflict of interest for board members. *Id.* The author stated that he has "run the LTV math myself" with respect to publicly available information about BofI's related party loans (from "Zillow records," "NextAce title records," "county mortgage records," and "Bloomberg Law searches") and offers a detailed explanation of the outcome suggesting that BofI's statements that its loans to related parties are "on the same terms as those prevailing at the time for comparable loans" were not true. *Id.* The author concludes by stating, "[s]o, if you, like me, are wondering why this bank never hired an external auditor to investigate recent allegations — perhaps these loans give us all a taste for the culture of compliance at the company." *Id.*

Real Talk Investment's November 18, 2015 article states that his "research suggests that BOFI has employed a former felon for over 5 years in a very senior and pivotal role," which likely violates Section 19 of the Federal Deposit Insurance Act. Real Talk Investments, *Undisclosed Executive History May Be Final Blow for BOFI*, Seeking Alpha (Nov. 18, 2015), https://seekingalpha.com/article/3695396-undisclosed-executive-history-may-final-blow-bofi . The author states that BofI's employment of an individual convicted of a felony "suggests not only [*31] an absolute lack of internal controls, but a potential blatant violation of federal law." *Id.* The article "assesses" the potential fine for this conduct at $1.9 billion, and asserts that the executive at issue "likely" had been "a major contributor to the bank's massive mortgage loan growth over the past 5 years." *Id.*

Aurelius's November 30, 2015 article discusses Allrich's October 22 "clarification" of Garrabrants's statements about the external auditor's conclusions. Aurelius, *BofI: Chairman Contradicts CEO's Assertions Regarding External Auditor's 'Without Merit' Finding*, Seeking Alpha (Nov. 30, 2015), https://seekingalpha.com/article/3721236-bofi-chairman-contradicts-ceos-assertions-regarding-external-auditors-without-merit-finding . Aurelius surmises that BofI's concurrently pending deal with H&R Block created "enormous financial incentives to delay or withhold [BofI's internal investigation] report from BDO [the external auditor] prior to the completion of its audit." *Id.* Aurelius also noted that BDO has a history of "audit failures." *Id.*

Finally, Aurelius's January 6, 2016 article states that BofI's audit committee had been "infected" by related party loans to members of the committee. (ECF No. 123-8.) Aurelius notes that multiple public documents indicate that Grinberg served as a "key executive" in a third [*32] party that received financing from BofI while Grinberg was serving as BofI's Audit Chairman. (*Id.* at 1-10.) Aurelius criticizes BofI for not disclosing these deals. (*Id.* at 10-12.) The article also explains how Grinberg's dual roles in BofI and the third-party partner creates a conflict of interest. (*Id.* at 12-13.) It also suggests that the failure to disclose this information indicates defects in BofI's "internal audit function." (*Id.* at 13-18.)[5]

---

[5] There are three other articles identified in the SAC that are not relevant to either (1) BofI's loan underwriting standards or (2) internal controls and compliance infrastructure. For the sake of comprehensiveness, the Court describes them below.

The Court finds these articles insufficient for two reasons. First, they suffer the same flaw as those discussing BofI's loan underwriting standards—they rely exclusively on previously disclosed public information, and Plaintiff offers no plausible reason why the market would not have already incorporated this information into its pricing prior to the articles' publication. *Bonanno, 2016 U.S. Dist. LEXIS 119194, 2016 WL 4585753, at \*4*.

Second, and perhaps more importantly, these articles are not relevant to the misrepresentations the Court has found to be actionable in the context **[\*33]** of BofI's internal controls and compliance infrastructure. While these articles identify many serious violations of federal law and securities regulations, none of them suggest that BofI had not increased its spending with respect to its compliance infrastructure.[6] As discussed above, the only actionable statements made by Garrabrants in this area are his assertions that BofI had made "significant investments" in its compliance infrastructure" and "spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel." (ECF No. 113 at 20.) As with the *Erhart* Complaint, none of the articles just described contradict that statements or suggest that they were false. Because the articles did not disclose the falsity of the actionable misrepresentations identified by the SAC, the SAC fails to allege loss causation with particularity as to Garrabrants's statements about BofI's internal controls and compliance infrastructure.

## V. Conclusion

In sum, the SAC fails to identify corrective disclosures of the falsity of Garrabrants's statements that this Court has found to be actionable. In the absence of any other indication that Defendants' misrepresentation **[\*34]** caused Plaintiff economic loss, the SAC fails to state a claim for securities fraud. As a result, the Court **GRANTS** Defendants' motion for judgment on the pleadings. The Court, however, also **GRANTS** Plaintiff leave to amend the SAC to cure the deficiencies discussed above. Plaintiff may file a Third Amended Complaint within 21 days of the date of this order.

If Plaintiff chooses to amend its complaint, the Court reminds Plaintiff that there is little correlation between a complaint's length and the sufficiency of its allegations. While the pleading standards applicable to Plaintiff's claims may be heightened, that fact does not abrogate *Rule 8*'s requirement that a complaint be short and plain. To the contrary, even under heightened pleading standards "[i]t is the duty and responsibility, especially of experienced counsel, to state th[e] essentials in short, plain and non-redundant allegations." *Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998)*.

---

Aurelius's November 5, 2015 article suggests that a filing by BofI in the *Erhart* action "confirm[ed] the existence of undisclosed subpoenas [and] nonpublic government investigations, including OCC investigations." Aurelius, *Recent BOFI Court Filing Confirms Existence of Undisclosed Subpoenas and Nonpublic Government Investigations*, Seeking Alpha (Nov. 5, 2015), http://seekingalpha.com/article/3652296-recent-bofi-court-filing-confirms-existence-undisclosed-subpoenas-nonpublic-government. Aurelius notes that despite Garrabrants's failure to list an SEC subpoena relating to a client, details of that investigation "have already been posted publicly for some time," and thus Garrabrants should have disclosed it. *Id.*

Real Talk Investment's December 16, 2015 article asserts that Ball's statements about BofI should not be considered credible because Ball had worked for 18 years at La Jolla Bank, which failed "due to fraud and excessive growth." Real Talk Investments, *Former BofI Head Auditor's Career History Raises Questions About His Declaration*, Seeking Alpha (Dec. 16, 2015), https://seekingalpha.com/article/3759586-former-bofi-head-auditors-career-history-raises-questions-declaration.

Finally, Aurelius's February 3, 2016 article discusses how BofI, despite marketing itself as "branchless," had recently opened a brick and mortar branch in Nevada. Aurelius, *Why BOFI Created A Phantom 'Full Service Branch' In The Nevada Desert*, Seeking Alpha (Feb. 3, 2016), https://seekingalpha.com/article/3859626-bofi-created-phantom-full-service-branch-nevada-desert . Aurelius notes that BofI had not disclosed the existence of this branch in its SEC filings or investor relations materials, and reveals that the office is staffed by just one individual who was responsible for an enormous amount of business. *Id.* Aurelius concludes that the purpose of the Nevada branch is to evade California's interest rate limitations. *Id.*

---

[6] For the same reason, the alleged October 30, 2015 filing made by BofI in the *Erhart* action revealing the existence of "investigations by the OCC" and other potential ongoing enforcement investigations (*see* ECF No. 79 at 75-76 ¶¶ 225-26, 125 ¶ 401) was not a relevant disclosure because it did not shed any light on BofI's compliance infrastructure. The revelation that government entities may have been investigating BofI did not provide information to the market about whether Garrabrants's statements about BofI investing additional resources in BofI's compliance offices were false.

**IT IS SO ORDERED**.

Dated: December 1, 2017

/s/ Gonzalo P. Curiel

Hon. Gonzalo P. Curiel

United States District Judge

**End of Document**