# United States District Court
# Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

JAN 3, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY:____BH____DEPUTY

|  |  |
|---|---|
| Pamela Miller, et al.<br><br>          Plaintiffs,<br><br>v.<br><br>PCM, Inc., et al.,<br><br>          Defendants. | LACV 17-3364-VAP (KSx)<br><br>**Order Granting Defendant's Motion to Dismiss First Amended Complaint with Leave to Amend**<br><br>**(Doc. No. 32.)** |

On October 6, 2017, Defendants PCM, Inc., Frank F. Khulusi, and Brandon H. Laverne filed their Motion to Dismiss the First Amended Complaint ("FAC") filed by Lead Plaintiffs[1] Stephen Wise, Kenneth Rubenfeld and Radovan Rasa.  (Doc. No. 32.)   Plaintiffs filed their Opposition on November 3, 2017 (Doc. No. 34) and Defendants filed their Reply on November 17, 2017 (Doc. No. 37).  Defendants filed a Supplemental Notice of Recent Authority on December 6, 2017 (Doc. No. 39), and Plaintiffs filed a Supplemental Notice of Recent Authority on December 14, 2017 (Doc. No. 40).

---

[1] The Court issued an order appointing Stephen Wise, Kenneth Rubenfeld, and Radovan Rasa as Lead Plaintiffs on July 27, 2017.  (Doc. No. 26.)

On its own motion, the Court continued the hearing on Defendants' Motion to December 18, 2017.  (Doc. No. 38.)  The Court held a hearing on the Motion on December 18, 2017.  (Doc. No. 41.)

After considering all papers filed in support of and in opposition to the Motion to Dismiss and the parties' oral argument, the Court GRANTS the Motion with leave to amend.

# I. SUMMARY OF ALLEGATIONS[2]

[2] Both parties have filed requests for judicial notice.  Defendants request that the Court take judicial notice of: 1) an online blog post entitled "Buyer's Remorse: Lawsuits Reveal Significant Risk with PCM's Largest Acquisition," dated May 2, 2017, and posted on the website www.seekingalpha.com; 2) excerpts from the Form 10-Q filed by PCM with the Securities and Exchange Commission on May 10, 2017; and 3) excerpts from the Form 10-Q filed by PCM with the SEC on August 9, 2017.  (Doc. No. 33.)  Plaintiffs request that the Court take judicial notice of: 1) PCM's Form 8-K and Exhibit 99.1, filed with the SEC on March 16, 2015; and 2) PCM's Exhibit 2.1, the Asset Purchase Agreement, to its form 8-K/A, filed with the SEC on April 29, 2015.  (Doc. No. 35.)  The SEC filings are undisputed matters of public record and are proper subjects for judicial notice insofar as the Court takes notice only that the filings were made without assuming the truth of the filings.  See In re Bare Escentuals, Inc. Sec. Litig., 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) ("granting defendants' request to take judicial notice of SEC filings, but specifying that they will not "where inappropriate" be considered for the truth of the matter asserted.").  Moreover, the Court may take judicial notice of the Seeking Alpha blog post insofar as it takes notice only that the post was published on May 2, 2017 without expressing any opinion as to the truth of the post's contents.  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (district court may consider "documents incorporated by reference in the complaint … without converting the motion to dismiss into a motion for summary judgment.").  As both requests are unopposed and contain documents that are incorporated by reference in the FAC and whose authenticity no one contests, the Court GRANTS these requests and incorporates some of the information contained in these documents in its summary of Plaintiffs' allegations.  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).

PCM is a publicly-traded company that re-sells technology products and services, including both hardware and software.  (FAC ¶¶ 2, 13, 15.) PCM trades on the NASDAQ, is covered by multiple analysts, and its securities are traded in "efficient markets."  (Id. ¶ 128.)  Mr. Khulusi is PCM's CEO and Chairman of the Board and Mr. LaVerne is PCM's Chief Financial Officer, Chief Accounting Officer, and Treasurer.[3]  (Id. ¶ 1.)  Plaintiffs allege Defendants violated federal securities law; they now seek remedies under sections 10(b) and 20(a) of the Securities Act of 1934 and Rule 10b-5 promulgated thereunder on behalf of a class consisting of "all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of PCM from August 10, 2015 through May 2, 2017, both dates inclusive (the 'Class Period')."  (Id.)  Plaintiffs allege they purchased PCM securities "at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosure [that was published on May 2, 2017]."  (Id. ¶ 13.)

On March 16, 2015, PCM filed a Form 8-K with the Securities and Exchange Commission ("SEC") reporting that it entered into an Asset Purchase Agreement ("APA") to acquire the assets of a publicly traded corporation now known as Collab9, Inc. ("Collab9").  (Id. ¶ 23.)  Collab9 was founded by Attiataz Din, who owned 70% of Collab9's stock at the time of the acquisition.  (Id. ¶ 2.)  The assets PCM purchased included Collab9's customer relationships, confidential information, and proprietary business model.  (Id.)  PCM placed the Collab9 assets in a subsidiary entity it owned

---

[3] Mr. Khulusi and Mr. LaVerne are hereinafter referred to as the "Individual Defendants."

named En Pointe Technologies Sales, LLC ("En Pointe").  (Id.)  In a March
16, 2015 press release, PCM described this acquisition as "the largest
acquisition by PCM … based on revenues [that would] bring the
consolidated business significantly increased scale."  (Id. ¶ 24.)

On June 17, 2015, PCM filed another Form 8-K, to which it attached
En Pointe's financial statements for the fiscal years ending September 30,
2012, 2013, and 2014, which PCM told investors were prepared in
accordance with Generally Accepted Accounting Principles ("GAAP").  (Id. ¶
3.)  PCM attached "pro forma results" in which it combined the financial
results of PCM and En Pointe, for the 2014 calendar year and the first three
months of 2015.  (Id.)  In this Form 8-K, PCM attributed $40 million in
goodwill to the En Pointe assets, and over $8 million in "intangible assets" to
En Pointe, $6.2 million of which was designated for "non-compete
agreements" and "contractual relationships."  (Id.)

PCM "quickly discovered" that the En Pointe financials it presented to
investors "were materially false, overstated En Pointe's earnings by millions
of dollars, materially overstated En Pointe's assets and earning capacity,
and that the economic loss to PCM was 'far greater' than the millions of
dollars of overstated value."  (Id. ¶4.)

The En Pointe assets included a contractual relationship with Ovex
Technologies, Ltd. ("Ovex"), also founded by Mr. Din.  (Id. ¶ 5.)  Ovex
provided IT and other services to En Pointe's customers, and also recruited
and retained customers.  (Id.)  After the acquisition, Ovex maintained and

4

operated PCM's IT structure and had access to En Pointe's confidential information, trade secrets, and non-compete agreements.  (Id.)  "The Ovex relationship quickly went sour," as Ovex employees refused to provide PCM with its own confidential information and shared PCM's information with PCM's competitors.  (Id. ¶ 6.)  Ovex employees began "wooing" PCM's customers to move to a competitor.  (Id.)  PCM either knew about the souring of this relationship or turned a blind eye to it.  (Id. ¶¶ 34-43.)

During the Class Period, in every quarterly and annual filing, PCM chose not to restate, retract, or tell investors not to rely on the "pro forma" results and false financials, and decided not to undertake an interim impairment analysis of goodwill and intangible assets.  (Id. ¶¶ 44-56, 101, 109, 115, 119.)  Furthermore, although PCM warned investors generally about the risks of integrating acquired companies and material declines in the value of goodwill and intangible assets, it hid from investors that these risks had actually materialized.  (Id. ¶¶ 44-56, 67-71.)

On December 5, 2016, Collab9 filed suit against PCM in Delaware state court, claiming underpayment of earn-out payments.  (Id. ¶ 45.)  PCM initially filed an answer denying these charges, but filed no counterclaims. (Id.)  "On the same date, however, PCM's attorneys wrote a private, detailed letter to Collab9's counsel, laying bare PCM's knowledge of the falsity of the En Pointe financials, and claiming that Collab9 violated section 6.5 of the APA."  (Id.)  In the letter, PCM explained that it chose not to assert counterclaims in its answer because it sought to resolve the matter informally.  (Id.)  This failure to raise the counterclaims, however, effectively

5

hid PCM's knowledge of the falsity of the En Pointe financials from PCM's investors.  (Id.)

On March 9, 2017, Collab9's attorney responded to PCM's counsel, noting that although PCM had filed the financial statements with the SEC, "PCM has not retracted or restated any of those SEC filings."  (Id. ¶ 46.) That same day, PCM filed its Form 10-K for the 2016 year with the SEC, describing the allegations brought by Collab9 in the Delaware lawsuit, but omitting any potential counterclaims.  (Id. ¶ 48.)

On March 16, 2017, PCM's counsel responded to Collab9, stating that any potential settlement negotiations were closed.  (Id.)

On April 11, 2017, PCM filed a motion to amend its answer in the Collab9 lawsuit, seeking to assert counterclaims against Collab9.  (Id. ¶ 49.) In its motion, it repeated the claims contained in the letters regarding material understatement of liabilities and overstatement of earnings, and blaming both Collab9 and Mr. Din.  (Id. ¶ 49.)  Specifically, PCM accused Collab9 of "knowingly" misleading PCM about the true earning capacity of the business, and asserted that if it had known the truth about Collab9's finances, it would not have acquired the En Pointe assets.  (Id.)

During the Class Period, PCM never disclosed to investors that the financial statements were materially false, nor did PCM directly tell investors that its economic loss was "far greater" than millions of dollars, that the financial statements and pro forma results it filed were materially false and should not be relied upon.  (Id. ¶¶ 50-52.)  Nor did PCM restate or correct

any financial statements or pro forma results or inform investors that it had failed to prepare them in accordance with GAAP. (Id. ¶¶ 53-54.) "In fact, PCM created the impression that there was nothing wrong with the financial statements or the $40 million in goodwill attributable to En Pointe it had recorded, writing in both the 2016 10-K, after PCM had admitted, privately, the falsity of the financial statements, in the 2015 10-K, filed March 15, 2016, and in every quarterly report during the Class Period, that '[w]e performed our annual impairment analysis of goodwill and indefinite-lived intangible assets for possible impairment as of October 1 … [and] [a]s a result of our annual impairment analysis as of October 1 … we have determined that no impairment of goodwill and other indefinite-lived intangible assets existed." (Id. ¶ 55.) Furthermore, during the Class Period, PCM never impaired the intangible assets it attributed to En Pointe, despite PCM's knowledge of the falsity of En Pointe's financials, and created the impression that there was nothing wrong with its financial statements. (Id. ¶ 56.)

On May 2, 2017, a person writing under the name "Rota Fortunae"[4] published an article on the website SeekingAlpha.com entitled "Buyer's Remorse: Lawsuits Reveal Significant Risk With PCM's Largest Acquisition." (Id. ¶ 76.) This article, available to the public, revealed to investors the falsity of the En Pointe financials filed by PCM with the SEC, and Ovex's material breaches of its contract with PCM. (Id. ¶ 77.) According to the article: 1) PCM knew that its filed financial statements were false and

---

[4] In their Reply, Defendants note that "Rota Fortunae" is Latin for "Wheel of Fortune." (Doc. No. 36 at 9.)

withheld that information from investors; 2) had PCM known about the truth of the En Pointe finances, it would not have agreed to acquire Collab9; 3) the existence of Ovex and its importance to PCM's performance; 4) Collab9 and Mr. Din's control over Ovex and their obstruction of PCM and En Pointe's access to Ovex; 5)  PCM knew about the Ovex issues and withheld that information from investors; 6) Collab9's interference with Ovex's contract with PCM had damaged PCM's and En Pointe's goodwill with many of its customers; and 7) En Points' expertise in "servicing its customers" actually "resides at Ovex."  (Id. ¶ 77.)  The author of the article disclosed that he or she is a short-seller of PCM, and further disclosed the following:

> IMPORTANT – Please read this Disclaimer in its entirety before continuing to read our research opinion.  Investors are encouraged to conduct their own due diligence into these factors.  Additional disclosure: This article represents the opinion of the author as of the date of this article.  The information set forth in this article does not constitute a recommendation to buy or sell any security.  This article represents the opinion of the author as of the date of this article.  This article contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms.  All are subject to various factors, any or all of which could cause actual events to differ materially from projected events.  This article is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness.  The author makes no representation as to the accuracy or completeness of the information set forth in this article and undertakes no duty to update its contents.  The author may also cover his/her short position at any point in time without providing notice.  The author encourages all readers to do their own due diligence.

(Doc. No. 33-1 at 11-12.)

After this blog post was published online, the price of PCM's shares fell $5.35 per share, or 22% over the next two days, from $24.35 to $19.00, which damaged investors.  (FAC ¶ 78.)

Based on the foregoing, Plaintiffs bring two claims: 1) Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and 2) Violation of Section 20(a) of the Exchange Act against individual Defendants.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief.  Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v Twombly, 550 U.S. 544, 555 (2007).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005).  "The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court."  Schwarz v. United States, 234 F.3d 428, 435 (9th Cir. 2000).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide

9

the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F. 3d 1202, 1216 (9th Cir. 2011).

As the FAC brings securities fraud claims, it is also subject to the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §

78u-4.  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir.

2009).  Rule 9(b) requires that "a party must state with particularity the

circumstances constituting fraud or mistake."  The Ninth Circuit has held that

Rule 9(b) further requires "an account of the time, place, and specific

content of the false representations as well as the identities of the parties to

the misrepresentations," and that the allegations "be specific enough to give

defendants notice of the particular misconduct which is alleged to constitute

the fraud charged."  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007)

(internal citations omitted).  Similarly, the PSLRA requires that "the

complaint shall specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is

formed."  15 U.S.C. § 78u-4(b)(1)(B); Tellabs, Inc. v. Maker Issues & Rights,

Ltd., 551 U.S. 308, 321 (2007).

## III.   DISCUSSION

Defendants assert  two bases for dismissal of the FAC: 1) Plaintiffs

fail to plead a legally cognizable "corrective disclosure" to satisfy the loss

causation element for a claim under section 10(b) and Rule 10b-5; and 2)

Plaintiffs fail to plead particularized facts giving rise to a strong inference

that Defendants made false or misleading statements or omissions with

scienter.  (Doc. No. 32 at 8.)  Furthermore, Defendants argue that as a

result of Plaintiffs' failure to state a viable primary claim under Section 10(b)

and Rule 10b-5, that the Court must also dismiss the derivative Section

20(a) claim.  (Id. at 32.)

### 1.   SECTION 10(B) AND RULE 10B-5

Section 10(b) of the Exchange Act prohibits "any manipulative or deceptive device or contrivance in contravention of [SEC regulations] in connection with the purchase or sale of any security registered on a national securities exchange."  15 U.S.C. 78j(b) (2010).  Rule 10b-5 prohibits companies from "mak[ing] any untrue statement of a material fact", "omit[ting] to state a material fact necessary in order to make the statement made … not misleading," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. 240.10b-5.

"There are six elements to a securities fraud claim under § 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter (i.e., a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation."  Loos v. Immersion Corp., 762 F.3d 880, 886-87 (9th Cir. 2014).  These elements are "strenuous but well established."  Curry v. Yelp Inc., __ F.3d ___, 2017 WL 5583889, at *3 (9th Cir. Nov. 21, 2017).

At issue in this case are the elements of scienter and loss causation.

### a. <u>Scienter</u>

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" <u>Police Ret. System of St. Louis v. Intuitive Surgical, Inc.</u>, 759 F.3d 1051, 1061 (9th Cir. 2014) (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n. 12 (1976)).  To plead scienter, the plaintiff must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  <u>In re Daou Systems</u>, 411 F.3d 1006, 1014-15 (9th Cir. 2005).  "A securities fraud complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Curry</u>, 2017 WL 5583889, at *3 (quoting <u>Tellabs</u>, 551 U.S. at 324). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' ... Yet the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." <u>Tellabs</u>, 551 U.S. at 324; <u>see also</u> <u>In re Iso Ray, Inc. Sec. Litig.</u>, 189 F. Supp. 3d 1057, 1075 (E.D. Wash. 2016) (citing <u>South Ferry LP, No. 2. v. Killinger</u>, 542 F.3d 776, 784 (9th Cir. 2008) ("A plaintiff must show that a defendant engaged in knowing or intentional conduct.")).

A court reviewing a complaint's scienter allegations conducts a two-part inquiry for scienter: first, it "determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and second, if no individual allegation is sufficient, it "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient

13

allegations combine to create a strong inference of intentional conduct or deliberate recklessness." <u>Curry</u>, 2017 WL 5583889, at *4 (quoting <u>New Mexico State Inv. Council v. Ernst & Young LLP</u>, 641 F.3d 1089, 1095 (9th Cir. 2011)). The court must also "'take into account [any] plausible opposing inferences.'" <u>Zucco</u>, 552 F.3d at 990 (quoting <u>Tellabs</u>, 551 U.S. at 323).

"Omissions are actionable under [§10(b)] and Rule 10b-5 thereunder only if the party omitting the fact had a duty to disclose that fact." <u>In re Amgen Inc. Sec. Litig.</u>, 544 F. Supp. 2d 1009, 1029-30 (C.D. Cal. 2008) (citing <u>Chiarella v. United States</u>, 445 U.S. 222, 230 (1980)). "To be actionable under securities law, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." <u>Brody v. Transitional Hospitals Corp.</u>, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, to allege that a defendant acted with scienter in omitting information, a plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." <u>Zucco</u>, 552 F.3d at 991. This requires the pleading of particularized facts that give rise to a strong inference that the defendant intended to mislead the plaintiff through its omission or knew that the plaintiffs would be misled by the omission. <u>See</u> <u>Amgen</u>, 544 F. Supp. 2d at 1028-29 (denying motion to dismiss § 10(b) claim where the plaintiff had alleged facts giving rise to the inference that defendants had "actual knowledge" that its statements would mislead the public).

The parties identify three main points of contention with respect to scienter: (1) whether the FAC adequately pleads Defendants' scienter in their alleged failure to warn investors not to rely on the FY12-1Q15 Collab9 and En Pointe Financial Information in the SEC filings; (2) whether the FAC adequately pleads Defendants' scienter in their alleged failure to disclose harm to PCM's business and the "materialization" of risks allegedly caused by the disintegration of the Ovex/En Pointe/PCM relationship; and (3) whether the FAC adequately pleads Defendant's scienter in their alleged failure to conduct a proper impairment analysis of goodwill and intangible assets.

### i. Failure to Warn Investors Not to Rely on Collab9 and En Pointe Financial Information

According to Defendants, the FAC's "core failure" is that it lacks the requisite factual particularity under Rule 9(a) and the PSLRA "to support the conclusory allegation that PCM 'quickly discovered' the falsity of the FY12-1Q15 financial information 'within months' of the acquisition."  (Doc. No. 32 at 25.)  Defendants point out that the soonest the Court could infer Defendants' awareness of inaccuracies in the Collab9 and En Pointe financial information is February 2017, when PCM allegedly wrote to Collab9 regarding potential counterclaims in the Delaware lawsuit.  (Id.) Defendants further argue that "PCM's aggressive pursuit of misrepresentation claims against Collab9 for providing PCM with potentially inaccurate financial information is itself inconsistent with the notion that PCM knew or was deliberately reckless in not knowing the falsity of that information earlier," as PCM could not state a fraud claim against Collab9 in

15

state court if it had known of the falsity of the aforementioned financial information.  (Id. at 26)  Furthermore, Defendants contend that the FAC fails to allege particularized facts that give rise to a strong inference that Defendants, after February 2017, "would have rationally believed that an investor in PCM in 2017 might possibly rely upon or consider material stale 2012-2015 financial information about Collab9 (another company entirely) or the En Pointe assets before PCM acquired them two years earlier."  (Id. at 26-27.)

In their Opposition, Plaintiffs argue that the FAC is sufficient because it alleges that under SEC regulations and GAAP provisions, PCM was required to restate and inform investors not to rely on published pro forma results, and that in light of the undisputed importance of PCM's acquisition of the En Pointe assets, Defendants' failure to warn investors amounted to "conscious recklessness."  (Doc. No. 34 at 21-23.)  They also invoke the "Core Operations Doctrine," which supports an "infer[ence] that corporate officers had scienter by virtue of their 'knowledge of the critical core operation of their companies."  (Id. at 24 (citing Di Donato v. Insys Therapeutics, Inc., No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at *14 (D. Ariz. Aug. 1, 2017).)  Plaintiffs thus argue that PCM's acquisition of En Pointe "compelled senior management, monthly, to calculate En Pointe's revenue and profit, and authorize earn-out payments to Collab9 in the millions of dollars," and that after the pay-outs to Collab9 under the APA were "unexpectedly lower than anticipated," under the Core Operations Doctrine, Defendants should have realized that the financials were false and informed the investors of this falsity.  (Id. at 25-26.)

On this issue, the Court agrees with Defendants.  As a preliminary matter, the FAC's allegations that PCM "quickly discovered" the falsity of the En Pointe financials "shortly after" the acquisition fails to satisfy Rule 9(b)'s requirement that Plaintiffs "must state with particularity the circumstances constituting fraud or mistake," and "the who, what, when, where, and how of the misconduct charged."  See Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011).  As the FAC alleges that Defendants wrote to Collab9 in February 2017 regarding their potential counterclaims against Collab9 that concerned the falsity of the financial information, the Court finds it raises a plausible inference that Defendants were aware of the falsity at some point before February 2017.  Nevertheless, under the heightened pleading requirements of Rule 9(b) and the PSLRA, the Court finds that the FAC's allegation regarding when Defendants allegedly discovered the falsity of the Collab9 and En Pointe financials "within months" to be impermissibly vague and factually unsupported.  Plaintiffs' arguments in their Opposition that Defendants were made aware of the falsity of these statements through their monthly meetings under SEC regulations and GAAP provisions are unavailing, because these arguments are not supported by, nor do they reference, any factual allegations in the FAC.  The Court cannot consider factual allegations not made in the FAC.  See Schneider v. Cal. Dept. of Corrs., 151 F.3d 1194, 1198 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss") (emphasis in original).

Moreover, the FAC's allegations relating to SEC regulations and GAAP provisions provide an overview of Defendants' alleged obligations under these provisions, but do not allege specific facts connecting these obligations to Defendants' scienter in failing to warn investors of the falsity of the Collab9 and En Pointe financial information. These allegations are insufficient to support the application of the Core Operations Doctrine in this case. The Ninth Circuit, in affirming a district court's dismissal of a securities fraud class action complaint, has indicated that "[p]roof under this theory is not easy," and that the "plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations … or witness accounts demonstrating that executives had actual involvement in creating false reports."  Intuitive Surgical, 759 F.3d at 1062.  Again, Plaintiffs' Opposition argues that the PCM's senior management were "compelled" to meet monthly to calculate En Pointe's revenue and profit and authorize earn-out payments to Collab9, but is not supported by, nor does it reference, any allegations in the FAC.  There are no allegations of any admissions by Individual Defendants, nor that they attended meetings where they discussed Collab9 financials.

Nor have Plaintiffs demonstrated that this case is the "rare circumstance" in which it would be "absurd" to suggest that PCM's management was without knowledge of the Collab9 financials, because there are no allegations in the FAC to support this inference.  See id. Although the FAC alleges that Individual Defendants signed SEC filings and Sarbanes-Oxley statements (FAC ¶¶ 55, 59), the Ninth Circuit has held that the signing of such certificates "are not sufficient, without more, to raise a

18

strong inference of scienter on the part of [a company]."  Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 747 (9th Cir. 2008).  The FAC thus contains only mere conjecture as to Defendants' state of mind with regard to Defendants' "knowledge of the core operations" of the Collab9 and En Pointe financials, which is insufficient under the PSLRA.  See Curry, 2017 WL 5583889, at *5 ("None of the allegations forms a nexus between the wrongful behavior and Individual Defendant's knowledge"); Gammel v. Hewlett-Packard Co., 905 F. Supp. 2d 1052, 1079 (C.D. Cal. 2012) ("[M]ere speculation regarding what Defendants must have known is not an adequate substitute for allegations purporting to show that Defendants actually knew.").

Here, the Court finds the opposing inference offered by Defendants regarding Defendants' counterclaims against Collab9 in the Delaware case is more persuasive than the inference Plaintiffs propose.  See Tellabs, 551 U.S. at 323-24 ("To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.").  The FAC alleges that Collab9 sued PCM in Delaware on December 5, 2016, alleging that PCM underpaid Collab9 in the monthly earn-out payments under the APA.  (FAC ¶ 45.)  Under the theory offered by Plaintiffs in their Opposition, Defendants "quickly learned" of the falsity of the En Pointe and Collab9 financials "within months" of the March 16, 2015 acquisition date, but instead of immediately filing suit to recover losses, Defendants "ignored those claims and spent their efforts hiding the bad acts of a third party for some unknown reason – and then

suddenly acted on the matter two years later."  (Doc. No. 36 at 14-15.)
Defendants offer an alternative inference – that while PCM was paying
monthly earn-out payments to Collab9, based on then-current profits, "it was
not aware of any issues with the financials until it was sued by Collab9
related to the earn-out payments.  Only in analyzing Collab9's claim did the
potential falsity of the financials come to light, at which time PCM promptly
took action to recoup its losses, disclose that it was investigating claims
against Collab9 and then move publicly to assert such claims."  (Id. at 36.)

The FAC does not contain sufficient factual allegations to overcome
this alternative inference.  See Zucco, 552 F.3d at 990 ("A court must
compare the malicious and innocent inferences cognizable from the facts
pled in the complaint, and only allow the complaint to survive a motion to
dismiss if the malicious inference is at least as compelling as any opposing
innocent inference.").  As a matter of common sense, it would not be in
PCM's interest to wait until February 2017 before acting on its knowledge of
the falsity of the Collab9 and En Pointe financials, if it had learned of this
falsity long before Collab9 filed suit against PCM in December 2016.  In
sum, the FAC does not supply any factual allegations that support Plaintiff's
proposed inference that Defendants' failure to warn investors of the falsity of
the financials was intended to mislead investors; Defendant's alternative
proposed inference, on the other hand, offers a "plausible, nonculpable
explanation[]" for their conduct.  See Tellabs, 551 U.S. at 323.

For these reasons, the Court finds that the FAC does not adequately
allege that Defendants' failure to warn investors not to rely on the FY2015-

1Q2015 financials permits a plausible inference of scienter on Defendants' part.

### ii. Failure to Disclose Harms caused by Ovex/En Pointe/PCM Relationship

The FAC alleges that Defendants acted with scienter in not disclosing the harm to PCM's business allegedly caused by the disintegration of the relationship between Ovex, PCM, and En Pointe.  Defendants argue this allegation is insufficient because the "sole factual basis" for Plaintiffs' allegation that the risks of the acquisition "materialized" is the anonymous Seeking Alpha blog posting.  (Doc. No. 32 at 27.)  They note that the Ninth Circuit "takes a very dim view of anonymous sources cited in securities fraud complaints, making it clear that allegations attributed to anonymous witnesses must be scrutinized carefully for their 'reliability.'"  (Id. (citing Zucco, 442 F.3d at 985))  "[P]laintiffs do not and cannot allege any basis from which the Court can infer that the anonymous Seeking Alpha blogger is a reliable source of the assertion that the disclosed risks from the En Pointe acquisition or the breakdown of the Ovex/En Pointe/PCM contractual relationship 'specifically materialized.'"  (Id. at 28.)

In addition, Defendants point out that in its most recent Form 10-Q filed with the SEC, it states that it successfully mitigated any potential harm to PCM's business from the breakdown of the Ovex relationship.  (Id. at 28-29 n. 2). The form states, in relevant part, that PCM expected that its agreement for its outsourced services in Pakistan (ostensibly from Ovex) would expire in the third quarter of 2017, and that PCM "ha[s] taken steps to transition these IT, accounting, customer service and order management

and other support services to [its] wholly owned service operations in the Philippines and other geographies" and that PCM expected to "achieve longer term efficiencies, improved capabilities, and cost savings from this transition."  (Doc. No. 33-1 at 24.)

Plaintiffs counter that the FAC adequately pleads scienter based on Defendants' failure to warn investors, relying on the allegations (1) that Defendants admitted they would not have purchased the En Pointe assets from Collab9 if they knew that Ovex was under de facto control of Collab9 and Mr. Din; but (2) Defendants did know Mr. Din controlled Ovex and Collab9, and (3) Defendants knew that Ovex was sabotaging PCM's business operations.  (Doc. No. 34 at 27-28.)

In support of their position, Plaintiffs cite Flynn v. Sientra, 2016 WL 3360676, at *10-11 (C.D. Cal, June 9, 2016), in which the court found that the plaintiffs' allegations that the defendants' broad disclosure of certain risks "are more than plausibly misleading when viewed in conjunction with [the plaintiffs]' allegations that serious regulatory issues had already transpired by the time these statements were made, and that [individual defendants] knew or recklessly disregarded the existence of these issues." (Doc. No. 34 at 28.)

Notwithstanding the Flynn case, which does support Plaintiffs' argument that allegations of risk disclosures can support a finding of scienter, the Court finds that the FAC fails to plead scienter because there is insufficient factual support for its allegation that the risks of the En Pointe

acquisition "materialized."  Plaintiffs do not dispute that the anonymous Seeking Alpha blog post is the only basis for their allegation that PCM was harmed on account of the disintegration in the relationship with Ovex and En Pointe.[5]

In <u>Zucco</u>, the Ninth Circuit explained that "a complaint relying on statements from confidential[6] witnesses must pass two hurdles to satisfy the PSLRA requirements."  552 F.3d at 995.  First, the source of the statements "must be described with sufficient particularity to establish their reliability and personal knowledge."  <u>Id.</u>  Second, the statements "must themselves be indicative of scienter."  <u>Id.</u>  Moreover, the statements may only be relied upon where the source is described "with sufficient particularity to support the probability that the person in the position occupied by the source would

---

[5] Plaintiffs argue that the standard cited by Defendants in <u>Zucco</u> is inapposite in this case, and ask the Court to assume the reliability of the Seeking Alpha blog post.  (Doc. No. 34 at 22.)  In support of their position, they cite <u>In re China Educ. Alliance Inc. Sec. Litig.</u>, No. CV 10-9239 CAS (JCx), 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011) and <u>McIntire v. China Media Express Holdings, Inc.</u>, 927 F. Supp. 2d 105, 123-24 (S.D.N.Y. 2013). Upon examination of these cases, the Court finds they are not in conflict with the <u>Zucco</u> standard, nor do they persuade the Court to accept Plaintiff's position.  The twenty-five page report in <u>McIntire</u> was authored by an independent research group and the twenty-nine page report in <u>China Educ. Alliance</u> was authored by an "analyst firm."  These reports are distinguishable from the Seeking Alpha blog post at issue here, which was authored by an anonymous short-seller of PCM stock who does not profess to have any type of expertise in market analytics.

[6] Although the standard in <u>Zucco</u> explicitly applies to "confidential" witnesses, given the PSLRA's heightened pleading standards, the Court finds it reasonable to apply the <u>Zucco</u> standard to anonymous sources, such as the Seeking Alpha blog post, because both the confidential witnesses in <u>Zucco</u> and the author of the Seeking Alpha blog post are unknown persons whose reliability courts must gauge using external indicia.

possess the information alleged." Id.  The Seeking Alpha blog post fails to satisfy the PSLRA's requirements under this standard.  The author of the Seeking Alpha post discloses that the post represented his or her opinion as of the date of the article, and was "based upon information reasonably available to the author and obtained from sources the author believed to be reliable," but "such information and sources cannot be guaranteed as to their accuracy or completeness."  (Doc. No. 33-1 at 11-12.)  Moreover, assuming the truth of the author's statement that he or she "ha[s] no business relationship" with PCM, the author has not established that he or she is reliable and would have personal knowledge to describe PCM's inner workings.

Thus, as the Seeking Alpha post does not plausibly establish that the risks of the En Pointe acquisition "materialized," the Court finds that the FAC fails to plead that Defendants acted with scienter in not disclosing the harm to PCM allegedly caused by the disintegration of the Ovex/PCM/En Pointe relationship.

### iii.  Failure to Conduct Proper Impairment Analysis of Goodwill and Intangible Assets

Next, Defendants argue that the FAC's allegations that they did not conduct a proper impairment analysis of goodwill and intangible assets fail to support an inference of scienter.  (Doc. No. 32 at 29.)  "The overarching flaw with plaintiffs' allegations concerning impairment is that they fail at all to plead facts describing how defendants conducted their analysis, and specifically what actual assumptions they relied upon in conducting their analysis."  (Id.)  In support of their position, they cite City of Dearborn

Heights Act 345 Police & Fire Ret. System v. Align Tech., Inc., 856 F.3d 605 (9th Cir. 2017), in which the Ninth Circuit affirmed the district court's dismissal of the complaint for failure to plead scienter.

In Align, the plaintiff attempted to establish a strong inference that the defendants either knew or were deliberately reckless in ignoring that the goodwill of a company they had acquired was significantly inflated and the defendants' failure to conduct an interim goodwill impairment analysis based on GAAP principles.  Id. at 620-21.  The Ninth Circuit rejected this argument, noting that failure to follow GAAP, without more, "does not establish scienter."  Id. at 621 (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994)).  Given the complaint's lack of allegations regarding the "precise assumptions" that the defendants used in conducting the relevant goodwill valuation, the Ninth Circuit found that "the more compelling inference is that Defendants made a good faith but mistaken determination in its goodwill valuations that the positive factors outweighed the negative ones."  Id.

Align controls here.  In Align, the defendants determined there was no impairment after repeatedly conducting their analyses; similarly, the FAC here alleges that PCM repeatedly conducted its analysis and determined "that no impairment of goodwill and other indefinite-lived intangible assets existed."  (FAC ¶¶ 63-65.)  There are no factual allegations to support the notion that PCM acted with intent to mislead or deceive in failing to take into account the alleged falsity of the En Pointe financials or the troubles with

25

Ovex in its goodwill and intangible assets analysis.  As the Ninth Circuit held in Align,

> [A] corporation must exercise its judgment in assessing both positive and negative factors when determining whether interim goodwill impairment testing is necessary.  It therefore follows that a corporation's mere knowledge of negative factors that potentially indicate goodwill impairment does not of itself support an inference that a corporation acted with scienter in exercising its judgment to conclude that no goodwill impairment is likely to occur.  To plead an inference of scienter in this context, a plaintiff must allege additional facts that call into question the manner in which the corporation conducted its goodwill analysis.

856 F.3d at 621 (emphasis added).  The FAC fails to make such allegations.  Thus, the Court concludes that Defendants' alleged failure to conduct a proper impairment analysis of goodwill and intangible assets fails to support a strong inference of scienter.

### iv.  Holistic Evaluation

When considered holistically and in light of Defendants' opposing inferences, and that none of the contested allegations support a finding of scienter, the Court concludes the FAC fails to plead scienter.   At best, the FAC permits an inference that Defendants were negligent in their SEC filings and inattentive in monitoring the ongoing operations of the En Pointe acquisition, but this nonetheless falls short of pleading the "strong inference of intentional conduct or deliberate recklessness."  See Curry, 2017 WL 5583889, at *4

26

b.   **Loss Causation**

"Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." Loos, 762 F.3d at 887 (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005)).  "At the pleading stage … the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity [the corrective disclosure] rather than by changing market conditions, changing investor expectations, or other unrelated factors." Id.  The plaintiff must "plausibly allege that the defendant's fraud was 'revealed to the market and caused the resulting losses.'" Id. (quoting Metzler Inv. GMBH v. Corinthian Colls. Inc., 540 F.3d 1049, 1063 (9th Cir. 2008)).  Ninth Circuit precedent "requires a securities fraud plaintiff to allege that the market 'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.'" Loos, 762 F.3d at 887 (quoting Metzler, 540 F.3d at 1063).

Defendants argue that Plaintiffs fail to allege loss causation because the Seeking Alpha blog post is not a "corrective disclosure."  According to Defendants, the post was derived entirely from information that was publicly available -- SEC filings and filings in the state lawsuits -- "of which the stock market was presumed to be aware."  (Doc. No. 36 at 8 (quoting Loos, 762 F.3d at 890.)  Under the efficient market theory, which is premised upon the notion that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business," see Basic, Inc. v. Levinson, 485

27

U.S. 224 (1988), before the Seeking Alpha post was published on May 2, 2017, the price of PCM's stock already reflected all material public information presented in the post – including the state court lawsuits. (Doc. No. 32 at 20.) Thus, according to Defendants, it is not plausible for the May 2, 2017 posting to constitute a corrective disclosure, because the market was already aware of all of the information contained in the May 2, 2017 posting. Defendants additionally point out that district courts within the Ninth Circuit have rejected "allegations of loss causation based upon short-seller internet postings that merely compile and negatively characterize already publicly-available information." (Doc. No. 32 at 21 (citing In re Intrexon Corp Sec. Litig., No. 16-cv-02398-RS, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017), Rok v. Identiv, Inc., No. 15-cv-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), Bonanno v. Cellular Biomedicine Grp., Inc., No. 15-cv-01795-WHO, 2016 WL 4585753 (N.D. Cal. Sept. 2, 2016), In re Blue Earth, Inc. Sec. Class Action Litig., No. CV 14-08263-DSF (JEMx), 2015 WL 12001274 (C.D. Cal. Nov. 3, 2015), and In re Herbalife, Ltd. Sec. Litig., CV 14-2850 DSF (JCGx), 2015 WL 12734014 (C.D. Cal. July 28, 2015).) Furthermore, Defendants argue that this case fails to fall within the narrow circumstances in which the presentation of public information qualifies as a corrective disclosure, because the Seeking Alpha post was anonymous and did not purport to perform any expert analysis that would be beyond the reach of investors. (Doc. No. 32 at 22-23.)

In their Opposition, Plaintiffs argue that the Seeking Alpha post is a corrective disclosure because much of the information it relayed to the public would be burdensome for the average investor to access. (Doc. No.

34 at 18.)  For this reason, Plaintiffs argue that the market "had not absorbed any of the otherwise hidden admissions contained in the two state court filings until the publication of the Seeking Alpha article."  (Id.)

Plaintiffs, however, cannot and do not refute that the Seeking Alpha post was gleaned entirely from public filings and information that was "reasonably available" to its author, who professed no expertise, and clarified that the post represented his or her "own opinions."  (Doc. No. 33-1 at 11.)  As the FAC alleges that PCM traded in "efficient markets," the well-established "efficient market theory" applies here.  See Bonanno, 2016 WL 4585753, at *5 (citing Basic Inc., 485 U.S. at 246) ("Under an efficient market theory, it is not necessary for any specific individual to track down every piece of information on every stock.  One presumes that all public information is incorporated into the market price no matter how far flung it might be.").  This understanding of the efficient market theory has been adopted by many district courts within the Ninth Circuit.  See, e.g., Intrexon, 2017 WL 732952, at *7 (report that "expresses our research opinions, which we have based upon interpretation of certain facts and observations, all of which are based on publicly available information" was not a corrective disclosure); Herbalife, 2015 WL 1245191, at *5 ("The mere repackaging of already-public information by an analyst or a short-seller is simply insufficient to constitute a corrective disclosure.")

Moreover, although Plaintiffs attempt to distinguish this case from Loos, which they contend only supports the notion that "announcement of an investigation was not a corrective disclosure" (see Doc. No. 34 at 20),

the Court finds that the reasoning undergirding the holding in <u>Loos</u>
nonetheless supports Defendants' position.  In <u>Loos</u>, the Ninth Circuit
reasoned that "the announcement of an investigation does not 'reveal'
fraudulent practices to the market," because at the time of this
announcement, "the market cannot possibly know what the investigation will
ultimately reveal."  762 F.3d at 890.  "While the disclosure of an investigation
is certainly an ominous event, it simply puts investors on notice of a
<u>potential</u> future disclosure of fraudulent conduct.  Consequently, any decline
in a corporation's share price following the announcement of an
investigation can only be attributed to market speculation about whether
fraud has occurred."  <u>Id.</u> (emphasis in original).  The Seeking Alpha blog
post, like the investigation at issue in <u>Loos</u>, was certainly an "ominous
event" that did not bode well for PCM's investors upon its publication on
May 2, 2017.  <u>See id.</u>  Furthermore, like the investigation in <u>Loos</u>, it
contained "forward looking statements" expressing the author's opinion as
to what could happen to PCM in light of the lawsuits.  (<u>See</u> Doc. No. 33-1 at
11-12.)  At best, the Seeking Alpha post could potentially establish that a
"risk" or "potential" for fraud exists, which is insufficient for it to constitute a
corrective disclosure.  <u>See</u> <u>Loos</u>, 762 F.3d at 778.

    For these reasons, the Court finds the FAC does not adequately
plead loss causation.


### 2.    SECTION 20(A)

    To establish a claim under § 20(a), a plaintiff "must first prove a
primary violation of underlying federal securities laws, such as Section 10(b)

or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator."  In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1052 (9th Cir. 2014).  As the Court determined that Plaintiffs did not adequately plead a primary violation under § 10(b) or Rule 10b-5, the Court declines to address Plaintiffs' § 20(a) claim at this time.

### 3.   LEAVE TO AMEND

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities."  Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted).  The law in the Ninth Circuit is clear that "Rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality."  Eldridge v. Block, 832 F.2d 1132, 1135 (9th Cir. 1987).  When dismissing a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  Id. at 1130 (quoting Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks omitted)).  Accordingly, leave to amend should be denied only when allowing amendment would unduly prejudice the opposing party, cause undue delay, be futile, or if the moving party acted in bad faith. Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008).

Although the Court agreed with Defendants that the FAC failed to state plausible claims, the Court is not convinced by their arguments that

31

Plaintiffs would not be able to cure the deficiencies identified above. Accordingly, Plaintiffs are granted leave to amend the FAC.

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Motion to Dismiss the FAC with leave to amend.  Plaintiffs must file their Second Amended Complaint no later than January 24, 2018.

**IT IS SO ORDERED.**

Dated:   1/3/18

_____
Virginia A. Phillips
Chief United States District Judge

32